In re Kenneth F. REICH and Sophine J. Reich, Debtors.

ESTATE OF Kenneth F. REICH, Deceased and Sophine J. Reich, Plaintiffs,

v.

James BURKE, Sr. and Travelers Indemnity Company, Defendants.

Bankruptcy No. 81–00513.
Adv. No. 84–9041.

United States Bankruptcy Court, E.D. Michigan, N.D.

Nov. 18, 1985.

R.F. Rhead, Lansing, Mich., for plaintiffs.

Sidney B. Schneider, Midland, Mich., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARTHUR J. SPECTOR, Bankruptcy Judge.

The plaintiffs are the debtors Sophine J. Reich and the decedent's estate of her co-debtor husband, Kenneth F. Reich. The Reiches filed their voluntary petition for Chapter 7 relief on July 31, 1981. On March 12, 1984, they filed suit against the trustee of their Chapter 7 estate, and against his bond for the trustee's alleged negligence. Among the assets listed in their schedules was a parcel of real estate improved by two buildings, the larger of which housed an IGA grocery store and the other, a Dairy Mart. On March 10, 1982, the roof of the IGA store collapsed, destroying those premises. The plaintiffs allege that their grocery store was property of the Chapter 7 estate which was entrusted to the care, custody, and control of the defendant trustee; that he failed to perform his duties to insure the property against destruction by collapse and to remove or have removed the snow which accumulated on the roof; which negligence was the proximate cause of the collapse of the building, resulting in a loss of the plaintiffs' exempt equity of $15,250 ($7,500 each under § 522(d)(1) plus $125.00 each under § 522(d)(5)).

The defendant claimed that insurance was unavailable to him as a bankruptcy trustee because the property was vacant; that even if it were theoretically available, the estate lacked the means to make it insurable in fact and lacked the funds to pay the exorbitant premium; that he had no knowledge that it was necessary or customary to remove snow from roofs in the geographical location of this building; that the trustee is not suable for negligence in the performance of his duties; that even if he were, the debtors lack standing to sue for such negligence; that the property was abandoned by the estate prior to the collapse, and so he should not be held responsible for the loss; that since the trustee failed to assume the debtor's contract for the purchase of the land within the 60 days provided under § 365(d)(1), the contract was deemed rejected and the property was not property of the estate when the roof collapsed; that the proximate cause of the collapse was the unknown and unforeseeable structural weakness, design and construction of the roof supports coupled with an act of God; that the plaintiffs suffered no loss as there was no equity in the property; and that the plaintiffs are guilty of contributory negligence in that they also failed to insure their own alleged interest or to remove snow from the roof. Trial was conducted on August 9, 1985. The following constitutes my findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### MAY A CHAPTER 7 TRUSTEE BE SUED?

In this cold cruel world, infants and incompetents may be sued; charitable institutions may be sued; doctors and hospitals may be sued; municipal, school, state, federal and foreign governments and their officials may be sued; and, worst of all, judges may be sued. Chapter 7 trustees possess no special immunity from one of life's less pleasant experiences, and no compelling reason has been shown why one should be created at this time.

 Furthermore, no authority or reason is offered as to why this Court's prior authority is necessary before a party may institute suit against a Chapter 7 trustee. The only statutory provision which deals with this subject says simply that: "the trustee in a case under this title has capacity to sue and be sued." 11 U.S.C. § 323(b). Court approval is not mentioned as a prerequisite to such capacity. The implication is that none is required. In the event such prior authority is necessary, it is hereby

given, retroactive to the day the suit was filed.[1]

## IS A CHAPTER 7 TRUSTEE PERSONALLY LIABLE FOR ORDINARY NEGLIGENCE?

A trustee who fails to exercise due diligence to conserve assets of the bankruptcy estate must account for assets dissipated through his negligence. *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693 (6th Cir.1932). The measure of care, diligence and skill required of a bankruptcy trustee is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and of a similar object in view; and although a mistake of judgment is not a basis to impose liability on a trustee, a failure to meet the standard of care does subject him to liability. However, "a bankruptcy trustee is liable personally only for acts willfully and deliberately in violation of his fiduciary duties." *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982).

In reaching the latter conclusion, *Weaver* relied on a line of cases which, we believe, incorrectly attempted to differentiate between when a trustee is liable in his "official" capacity and when he may be held personally liable. The case which first clouded this area was *In re Johnson*, 518 F.2d 246 (10th Cir.), *cert. denied, sub. nom. Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). There, the Tenth Circuit Court of Appeals reversed the district court's order approving the Chapter XII trustee's final account and refusing to surcharge him for losses occasioned by his alleged negligent failure to properly supervise his bookkeeper, which led to her embezzling funds from the estate. The court held that the case was controlled by *Mosser v. Darrow*, 341 U.S.

267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), where the trustee was found personally liable for unlawful profits made by one of his employees from trading in certain estate securities. The Supreme Court there held that a trustee may be held personally liable not only for fraud or intentional wrongdoing but also for non-willful failure to perform duties required by law.

Indeed, the Supreme Court used the term "personal liability" three times in quick succession when discussing this topic. When criticizing the Court of Appeals' leniency toward the trustee, the Court stated:

It is argued, and the Court of Appeals appears to have been impressed by the argument, that this *surcharge* creates a very heavy liability upon a man who enjoyed no personal profit and must be condoned " 'so as not to strike terror into mankind acting for the benefit of others and not for their own.' " [*In re Federal Facilities Realty Trust,*] 184 F.2d 1, 8 [ (7th Cir.1950) ]. Trustees are often obliged to make difficult business judgments, and the best that distinterested judgment can accomplish with foresight may be open to serious criticism by obstreperous creditors aided by hindsight. Courts are quite likely to protect trustees against heavy liabilities for disinterested mistakes in business judgment. But a trusteeship is serious business and is not to be undertaken lightly or so discharged. *The most effective sanction for good administration is personal liability for the consequences of forbidden acts*, and there are ways by which a trustee may effectively protect himself against *personal liability*.

*Id.*, 341 U.S. at 273–274, 71 S.Ct. at 683 (emphasis added). As can be seen, the Supreme Court clearly equated the term

---

1. 28 U.S.C. § 959(a) is not applicable to this case. That section states:

Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

Since this is a case of a liquidating trustee in Chapter 7, it is apparent that Mr. Burke was not "carrying on business".

"surcharge" with "personal liability". The Court went on to recommend a procedure by which a trustee can protect himself against personal liability. It then went on to state: "A further remedy of a trustee for limiting, if not avoiding, *personal liability* is to account at prompt intervals ..." *Id.*, 341 U.S. at 274, 71 S.Ct. at 683.

The *Johnson* court went astray when it inexplicably cited, in a footnote, a commentary from 3A *Collier on Bankruptcy*, ¶ 62.03, pp. 1407–08 (14th ed.), which included the following:

> True, by acting in his official capacity the trustee does not incur a personal liability as does the trustee of an express trust ... The bankruptcy trustee acts as the representative of a separate entity, the estate; he obligates this entity ... [T]he General Orders and § 62a constitute but a statutory application of a thoroughly recognized and time-honored mode of enforcing the court's supreme authority: the right to *surcharge* the accountable officer wherever the court finds that he misused his discretion....

quoted in *In re Johnson*, 518 F.2d at 251, n. 5. (Emphasis in original). Similar language appears in 1985 Collier *Handbook for Trustees and Debtors in Possession*, ¶ 4.08, again without citation to authority. Quite simply, as it pointed to no authority for this proposition and since none could be found, we must conclude that *Colliers* was incorrect insofar as it meant to describe the trustee's liability to those involved in the bankruptcy case for failure to perform his statutory duties. Indeed, *Mosser v. Darrow, supra*, stands for a contrary principle of law. Further confusion lies in the *Johnson* court's continuing use of the term "surcharge", without explicating what this entailed, and in its reference to 76 Am. Jur.2d *Trusts*, §§ 325, 326, 510, (Lawyers Co-op 1975), which consistently refers to but nowhere defines the term "surcharge". When the term "surcharge" is confused in the above passage and then utilized without commentary in the *Johnson* opinion, it may be argued that the Tenth Circuit Court of Appeals held that the "surcharge" of the trustee meant something other than personal liability.

As stated above, the Supreme Court defined "surcharge" as the imposition of "personal liability" upon the trustee. Although *Johnson* does not explicitly say otherwise, it apparently is the source of the confusion picked up by the same court in a later case.

In *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir.1977), the court interpreted *Mosser v. Darrow, supra* as holding that a trustee is personally liable only for acts determined to be willfully and deliberately in violation of his duties, and liable in his official capacity only for acts of negligence. Inexplicably, the court found this holding in the following statement of the Supreme Court:

> ... the liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.

*Mosser v. Darrow*, 341 U.S. at 272, 71 S.Ct. at 682. From this the Tenth Circuit reasoned:

> Thus, a trustee in bankruptcy is not to be held personally liable unless he acts willfully and deliberately in violation of his fiduciary duties. A trustee in bankruptcy may be held liable in his official capacity *and thus surcharged* if he fails to exercise that degree of care required of an ordinarily prudent person serving in such capacity, taking into consideration the discretion allowed.

*Sherr v. Winkler*, 552 F.2d at 1375 (emphasis added). What the court clearly misread is the fact that the Supreme Court *equated* the term "surcharge" with the term "personal liability". Somehow or other, the Tenth Circuit took the term "surcharge" to mean a charge against the trustee's "official account" only. *Mosser v. Darrow* simply did not so hold.

This view of the matter is strongly supported in a thoughtful commentary on this issue:

This language [the above-quoted language in *Sherr*] is questionable, in that it tries to distinguish the surcharge of a trustee from personal liability while surcharge is in fact a means of imposing personal liability. In all the cases cited in the general discussion above concerning personal liability for loss to the estate in collection, preservation or distribution of the assets, surcharge and personal liability were synonomous.

... the decision cites *Mosser v. Darrow* for the proposition that a trustee or receiver is 'liable personally only for acts determined to be wilful and deliberate in violation of his duties' and 'liable in his official capacity, for acts of negligence,' for which the trustee is surcharged. As explained earlier, *Mosser* made no such distinction. On the contrary, that case shows just the opposite, for while the trustee in *Mosser* was found personally liable for a wilful and deliberate act, the result was a surcharge of the trustee. Surcharge, in other words, was and is merely the means of imposing personal liability upon a bankruptcy trustee or receiver for loss to the estate. It is certainly not, as the *Sherr* decision states, a means of imposing liability in his 'official capacity' unless that phrase is to be given a meaning entirely opposite to which traditional definition, i.e., where the estate rather than the fiduciary is required to bear loss to the third persons

...

*Sherr v. Winkler*, it seems, uses all the language pertinent to personal liability of bankruptcy officers, but the contradicting and confusing manner in which the court arranged the language gives it poor potential as a case precedent.

Tiller, *Personal Liability of Trustees and Receivers in Bankruptcy*, 53 Am.Bankr. L.J. 75, 99–102 (Winter 1979) (footnotes omitted).

A recent Ninth Circuit Court of Appeals decision adopts an analysis consistent with *Tiller* and criticizes *Sherr v. Winkler* and its progeny. In *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357, n. 26 (9th Cir.1983), the court expressly rejected the *Sherr* approach and, citing *Mosser v. Darrow, supra*, stated that a trustee "is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law." *Id.* at 1357. In criticizing *Sherr*, it explained:

Given that the "surcharge" itself means to impose "personal liability on a fiduciary for wilful *or* negligent misconduct in the administration of his fiduciary duties", *Black's Law Dictionary* 1292 (rev. 5th ed. 1979) (emphasis added), we find this [the *Sherr*] interpretation to be incorrect. Properly construed, the language quoted from *Mosser* indicates merely that the sort of personal liability which may be imposed on a trustee for the acts of his employees is not strict liability but rather liability depending at least on a showing of the trustee's own negligence; *Mosser* does not "hold" in any sense that personal liability does not obtain if such a showing of negligence is made.

*Id.* at 1358, n. 26.

In addition, the Second Circuit Court of Appeals very recently upheld a lower court surcharge of the Chapter XIII trustee, imposing personal liability on him for failure to perform his fiduciary duty to creditors to monitor the debtors' performance of their wage earner plan. In *In re Gorski*, 766 F.2d 723 (2nd Cir.1985) the lower court had found that the trustee's failure to carry out his obligations constituted "a material breach and default of his fiduciary duties and ... a *negligent* disregard of the rights and best interest of creditors." *Id.* at 725 (emphasis added). The issue on appeal was whether surcharge was the appropriate remedy. The court cited *Mosser v. Darrow, supra; In re Cochise College Park, Inc., supra* and *In re Johnson, supra* for the proposition that: "In the usual case, a surcharge is imposed on the fiduciary in the amount of the actual or estimated financial harm suffered by either the creditors or the estate and is payable accordingly." *Id.* at 727. Consequently, it affirmed the lower court's order surcharging the trustee for the amount the credi-

tors were harmed by his inaction, but reversed that part of the order which required that he pay the surcharge to the U.S. Treasury; instead, the case was remanded to the bankruptcy court for the imposition of an appropriate remedy. Most importantly, the court said: "There is no question that a trustee in bankruptcy may be held *personally liable* for breach of his fiduciary duties. *Mosser v. Darrow,* 341 U.S. 267 [71 S.Ct. 680, 95 L.Ed. 927] (1951). Such liability may attach as the result of negligent, as well as knowing or intentional, breaches." *Id.* at 727 (emphasis added).

Unfortunately, the Sixth Circuit Court of Appeals relied on *Johnson* and *Sherr* in *Ford Motor Credit Co. v. Weaver, supra.* In that case, Ford Motor Credit Co. sought to impose personal liability upon Robert Weaver, the debtor in possession, for his failure to safeguard the assets of Weaver Farms. The Court of Appeals, stating that a Chapter XI debtor in possession is bound to the same standards as a liquidating bankruptcy trustee, held that the ordinary prudent man standard is the standard to judge the conduct of a trustee and that a failure to meet this standard of care subjects the trustee to liability. The opinion's discussion of what type of liability is incurred compounds the confusion in this area. On this point the court cited *In re Johnson* and *Sherr v. Winkler.*[2] As has been amply demonstrated, those cases were incorrectly decided. Instead of relying upon Tenth Circuit precedent, the Court of Appeals could have merely looked to its own precedent which held to the contrary. In *Hartford Accident & Indemnity Co. v. Crow,* 83 F.2d 386 (6th Cir. 1936), the trustee in bankruptcy sued his predecessor in interest, the receiver in bankruptcy, for failure to insure the premises against loss by fire. On the day the trustee was appointed, but before he could qualify as trustee, the property of the estate was destroyed by fire. The court held that the receiver bore the duty to insure the property against such loss, and that his failure to do so resulted in his personal liability to the estate for the loss occasioned thereby. Although the term "personal liability" does not appear in the opinion, it is clear from the factual context of the case that that is what occurred. The Court of Appeals affirmed the district court's judgment in favor of the trustee and against the receiver and his surety. If all that was being sought was a mere disallowance of the receiver's fee, there would have been no need to discuss a "waiver of jury trial" or a *"judgment* in favor of the trustee". *Id.* at 387. (Emphasis added.) Instead, the court could have merely disallowed the receiver's compensation under § 62(a) of the Bankruptcy Act. Furthermore, if the assets of the estate itself were to be used to satisfy the judgment against the receiver, there would have been no benefit to the trustee in bringing the action, since it was the estate which was the plaintiff and the estate which would have been the defendant. The only reading of that case which makes any sense is that the trustee, on behalf of the estate, sued the receiver personally—and not in his "official" capacity—for the results of his negligence.

As the foregoing discussion makes clear, we think that *Sherr* was incorrectly decided. In establishing a distinction between a trustee's personal liability and his "official" liability, that decision misinterpreted established law, and it has been justly criticized on this point. By deciding *Weaver* on the basis of *Sherr* rather than on an earlier opinion of this circuit, the Sixth Circuit adopted a standard which is legally and practically difficult to accept. Nonetheless, *Weaver* is the most recent pronouncement by the Sixth Circuit on this subject and we are bound to follow it unless it may be distinguished. Although *Weaver* obviously dealt with different facts, there is no principled means of limiting its holding in such a way that it would not control this case. Thus, we proceed to

---

**2.** The court also cited *United States v. Sapp,* 641 F.2d 182 (4th Cir.1981), which opinion likewise followed *In re Johnson,* 518 F.2d 246 (10th Cir.) *cert. denied, sub. nom. Clark v. Johnson,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) and *Sherr v. Winkler,* 552 F.2d 1367 (10th Cir.1977).

analyze the instant case according to the standards enunciated therein. If the trustee was "merely" negligent, he is liable only in his "official" capacity, whatever that may be; however, if he willfully breached his duty, he is personally liable for any loss. Since the plaintiffs have consistently alleged that the defendant's breach of his fiduciary duty to preserve estate assets was negligent and not intentional, the defendant is liable, if at all, only in his official capacity.

## DOES A CHAPTER 7 TRUSTEE OWE A DUTY TO THE DEBTOR TO PRESERVE ESTATE ASSETS?

Although it is undeniable that a Chapter 7 trustee has the duty to preserve estate assets, 11 U.S.C. § 704(1); *Rife v. Ruble*, 107 F.2d 84 (6th Cir.1939); *Carson, Pirie, Scott & Co. v. Turner, supra,* no case has been found in which it was held that the duty was owed to the debtor. The defendant argues that he is the trustee for the benefit of creditors only and therefore owes no duty to the debtors. Therefore, even if he did fail to preserve the assets of the estate, the only parties harmed or who have standing to complain are creditors.

■ Whether a party has standing to sue depends on whether he has suffered a loss peculiar to him, sufficient to give him a genuine personal interest in the outcome. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Kay v. Austin,* 621 F.2d 809 (6th Cir.1980). The Bankruptcy Code contemplates that only estate assets be collected and liquidated for payment of dividends to creditors; however, the trustee frequently takes possession of assets in which the debtor maintains a property right known as an "exemption". If the trustee sells an asset in which the debtor has claimed an exemption, the por-

tion of the proceeds which are attributable to the exemption must first be paid to the debtor before any distribution may be made to unsecured creditors. *In re Lambdin,* 33 B.R. 11, 11 B.C.D. 103, 9 C.B.C.2d 673 (Bankr.M.D.Tenn.1983). The theory is similar to satisfying a mortgage or other lien on the assets; the exemption is, for all intents and purposes, a lien or encumbrance for the benefit of the debtor. Thus, when an asset encumbered by an exemption is lost or destroyed, the debtor has suffered a loss peculiar to him. Similarly, the Chapter 7 trustee owes a duty to preserve assets which are fully encumbered by the lien of a secured creditor. *In re National Molding Co.,* 230 F.2d 69, 71 (3d Cir.1956). Moreover, one who is neither a creditor nor the debtor has been held to have standing to sue the trustee for his failure to preserve assets which, it turned out, were not estate property, but belonged to a stranger to the case. *Rife v. Ruble, supra.* Thus, a debtor has standing to sue. The other side of that same coin is that since the debtor is a person who foreseeably may be harmed by the trustee's negligent failure to preserve the assets of the estate, the trustee's duty to preserve those assets runs to the debtor as well as to creditors. Indeed, aside from his right to exempt property, a debtor has a right to receive a dividend from the liquidation of estate property if all prior classes have been paid. § 726(a)(6). Although such an event is rare, it is not unheard of, especially where creditors fail to file their claims.

■ According to the defendant, when he failed to affirmatively assume the debtor's contract of purchase of the store within 60 days after the order for relief the contract of purchase was deemed rejected, pursuant to § 365(d)(1) [3] and so, as of September 30, 1981, the trustee no longer had

---

**3.** When this case was filed, that section read as follows:

In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of the debtor within 60 days after the order for relief, or within such additional time as the court, for

cause, within such 60-day period, fixes, then such contract or lease is deemed rejected. It was amended as part of the 1984 amendments. The amendment is not material in this case, and, since it affects only those cases filed after its effective date, it is inapplicable here.

an interest in or responsibility for the store. This argument is disposed of by our decision in *In re Britton*, 43 B.R. 605, 11 C.B.C.2d 1455 (Bankr.E.D.Mich.1984), which held that land contracts in Michigan are not "executory contracts" for purposes of § 365 of the Bankruptcy Code, but instead constitute secured claims to be dealt with under the concept of adequate protection.

The trustee also argues that he sought to abandon the property in question before the fateful day of the collapse, and that, but for the objection of the debtors, the building would not have been property of the estate when it collapsed. Therefore, they should not now be heard to say that the trustee should have preserved assets he sought to abandon. Furthermore, the argument goes, by operation of law, the building ceased to be property of the estate on the 16th day after the § 341 meeting of creditors, which was held on August 26, 1981. This follows from the effect of the Court's original form order for meeting of creditors, et. al., dated August 11, 1981, which stated "any objections to the debtor's claim of exempt property (Schedule B–4) must be filed within 15 days after the above date set for the meeting of creditors." Since the debtors claimed the store property exempt, pursuant to § 522(d)(1), in the amount of $15,250.00, and since no objection to that claim of exemption was filed by September 10, 1981, the exemption was deemed allowed, and the store was therefore deleted from the scope of the term "property of the estate" as of September 11, 1981. Consequently, the trustee lacked title to that property and had no duty to preserve it. The argument is cute but unavailing.

■ The provision in the Court's order of August 11, 1981, fixing a deadline for the filing of objections to the debtors' claim of exempt property is enforceable. *Cf. In*

*re Dembs*, 757 F.2d 777 (6th Cir.1985). Thus the $15,250 worth of real estate equity embodied in the building was duly exempted out of the estate. This, of course, did not mean that the building itself was no longer estate property; it just meant that the property was encumbered by a lien in favor of the debtors in that amount.

■ Upon closer examination, however, the question of whether the building was technically "in" or "out" of the estate when it was destroyed is immaterial. In our opinion, the only material question is whether the trustee had actual possession of the property when the injury occurred. If he had possession of the property, he owed a duty to preserve it arising under both his statutory responsibilities and common law bailment or agency theories. As a bailee for mutual benefit, a Chapter 7 trustee owes a common law duty to the bailor (in this case, the debtors to the extent of their exemption and the estate as to the balance) to exercise ordinary care to protect the building. *Godfrey v. City of Flint*, 284 Mich. 291, 279 N.W. 516 (1938). As the defendant had actual custody of the building when it collapsed, he was still responsible for its preservation. Likewise, if the trustee is considered the debtors' agent for the purpose of selling the property [4] so that they could realize their exemption, an agent, too, is under a duty to "exercise due care and diligence to keep the property from coming to harm ...". 3 Am.Jur.2d, *Agency*, § 212 (Lawyer's Co-op. 1962). Although generally an agent need not expend his own funds to preserve his principal's property, *id.*, there is a statutory procedure in bankruptcy cases, § 506(c), to allow a trustee to surcharge the principal for such expenses. Thus, since the defendant had actual custody and control of the property at the time of its collapse, he is responsible for the consequences.

---

**4.** As a matter of fact, what happened here was that the debtors attempted to sell their IGA store (and adjacent Dairy Mart) for several months prior to filing bankruptcy, had no success, gave up and requested the trustee to sell it for them. When the trustee chose to "sell" the property to the Cheboygan Bank via abandonment, the debtors objected to the "price" because they wanted more. They wanted something for their equity in the premises. In essence, the trustee was viewed by them as their agent for sale of their property.

 A trustee must make a determination early in the administration of the case which assets to administer and which to abandon. An asset with equity for the estate may nevertheless be something that should be promptly abandoned if the trustee's preservational responsibilities are burdensome. Indeed, the statute authorizing abandonment of estate property by a trustee speaks of the concepts of equity and burdensomeness in the disjunctive; if a trustee feels an asset is of inconsequential value and benefit to the estate *or* that it is "burdensome to the estate", he may abandon it. § 554. In this case, after a few weeks of inspection and attempts at sale, if it appeared to the defendant that the burden and risk of maintaining the property was greater than the probable return to the estate, he should have abandoned it long before the onset of winter.

## DID THE DEFENDANT BREACH HIS DUTY TO PRESERVE THE ASSETS?

The plaintiffs argued two theories of liability. With respect to the first, that the defendant negligently failed to insure the building against collapse, the evidence was uncontested that the building was vacant when the trustee acquired it, and that collapse insurance was: (a) unavailable at any cost; or (b) if available, obtainable only after capital improvements were made to the building or upon payment of an exorbitant premium for which the estate lacked sufficient funds. At the end of the trial, the plaintiffs conceded that they had failed to carry the burden of proof on this theory.

As to the second theory, that the defendant was negligent in failing to remove the snow from the roof, the plaintiff showed that due to the climate in Indian River, Michigan, residents are required to remove snow from their roofs periodically throughout the winter to prevent the very calamity which occurred here and that this was a well-known custom of which the defendant should have been aware. Since there was

no dispute about the fact that the defendant failed to either personally remove the snow or to employ someone else to do so throughout the 1981–1982 winter, the plaintiffs maintain that a breach of duty was shown. As the property lost substantially all economic value [5] as a result of its collapse due to the excessive accumulation of snow on the roof, the plaintiffs argued that they established all of the elements necessary for a finding of negligence.

 The defendant's affirmative allegations that the damage was caused by an act of God (i.e., that an unforeseeable catastrophe occurred) and/or that the collapse was due to unknown structural defects in the building were totally unsupported by proof. The affirmative defense of contributory negligence was argued but likewise not established. The plaintiffs filed bankruptcy and promptly moved to Illinois. Mr. Reich was in poor health and indeed died shortly after moving out of state in September, 1981. As Mrs. Reich was a bankrupt senior citizen who lived hundreds of miles from the property, she had no practical means to either insure her interest in the property or to remove the snow from the roof. Finally, as Mrs. Reich testified, the plaintiffs turned the building over to the trustee, trusting him to faithfully perform his duties, especially that of preserving and ultimately selling the property for the benefit of the estate and the debtors. Debtors have a right to depend upon such conduct and it would be unjust to hold them "negligent" for such an expectation. Thus, we find no contributory negligence.

 The defendant claimed that he had no knowledge of the custom up north to periodically remove snow from roofs. We find this assertion incredible. By his own testimony, the defendant has been a bankruptcy trustee since 1978 (thus at the time he received this case in July of 1981, he had already been a panel trustee for approximately three years) and was involved in the insurance industry for over 30 years in

---

5. Although no evidence was admitted nor formal stipulation entered as to the value of the property after the collapse, the fact that the property's value after the collapse was less than the $47,000 which encumbered it was implicitly conceded.

various capacities, including claims adjuster, claims manager, claims supervisor and insurance agent. Although this division of the Eastern District of Michigan is comprised of at least ten counties which suffer severe winters, and presumably the defendant would have had numerous cases in this region in his various occupations, he seeks expiation on the grounds that this was his first trusteeship in Cheboygan County and that the debtors never specifically told him that it was necessary to periodically remove accumulated snow from the roof. We decline to accept this explanation and find that the defendant knew, or at the very least, should have known, that a reasonably prudent person would from time to time cause the snow to be removed from the roof of the building. His failure to do so, despite the fact that the estate had, for almost a month prior to the collapse on March 10, 1982, over $720.00 on hand from which to hire the job done, constituted a breach of the defendant's duty of due care to preserve the estate's assets.

## DID THE PLAINTIFFS SUFFER DAMAGE AS A RESULT OF THE DEFENDANT'S NEGLIGENCE?

This was the main battleground in this case. The plaintiffs called a real estate appraiser to testify that, in his opinion, at the time the bankruptcy was filed, the store was worth between $63,000 and $81,500, inclusive of the value of the raw land. Since the encumbrances on the property equalled approximately $47,000, the plaintiffs argued that there was between $16,000 and $34,500 in equity available to pay them their $15,250 exemption. The defendant relied on the appraisal submitted by the Cheboygan Bank with its motion for abandonment filed on February 19, 1982, 19 days before the collapse. That appraisal valued the property at $45,784, about $1,000 less than the encumbrances on it. The appraiser who prepared it testified in

support of his original estimate. However, on cross-examination, it came out that he appraised the property as a vacant building and not as a grocery store, which is what it had been. The defendant also called a prospective purchaser with whom he held preliminary negotiations for the sale of the property. Although he made no offer (because the defendant's asking price was so high, he didn't think it was worth even entering into negotiations), he testified that he would have offered $50,000 for the property if the defendant's asking price were anywhere in that ballpark.[6]

Finally, the defendant testified that after accepting his position, he inspected and winterized the property and showed it to prospects on three different occasions. He received no offers of purchase at any price. After over six months of trying to sell the property, he felt that the bank's appraisal showing no net value to the estate was accurate and so he acceded in its request that he abandon the property. He would have done so before the collapse but for the debtors' objection to the entry of the order of abandonment. While the hearing on the debtors' objection was pending and before the hearing thereon could be held, the building collapsed.[7]

Thus the question boils down to: what was the value of the IGA store just prior to its collapse? The IGA store, together with the adjacent Dairy Mart, was bought on land contract in July, 1976 for a total of $80,000. No allocation was made in the contract as to the two separate properties. Furthermore, none of the plaintiffs' witnesses testified as to a fair allocation. However, the defendant's appraiser testified that the IGA store comprised 84½% of the value of the total properties. Since this allocation is unimpeached and uncontested, the Court will assume that the same allocation applied at the time of purchase in 1976. As a result, we find that the IGA store was

---

**6.** The trustee asked $100,000 for "the property". We believe this term meant both the IGA and the Dairy Mart together.

**7.** At that point, the bank withdrew its motion for abandonment. The trustee then filed his own application for abandonment which was granted by the Court on July 12, 1982, after a hearing on the debtors' continued objection.

purchased for approximately $67,600 in 1976. After four years of operation,[8] in which no improvements were made and in which the debtors were unable to do more than eke out a living,[9] the business declined precipitously due to Mr. Reich's failing health. As a result, they found it necessary to try to sell the business. Notwithstanding the foregoing negatives, the debtors listed their properties (both the IGA and the Dairy Mart) for sale in March, 1981 for $160,000,[10] because "all real estate appreciates" (testimony of plaintiff Sophine Reich). Four months later they filed bankruptcy and listed the properties (both the IGA and the Dairy Mart together without allocation) in their schedules at $150,000 in value. The realtor with whom they listed the property was eventually called by the plaintiffs to give his opinion as to the value of the property in the winter of 1981–1982. As stated earlier, in his opinion, the IGA property was not worth $135,200, (84.5% of the total asking price for both properties, allocable to the IGA) nor $126,750 (84.5% of the scheduled value of both properties), but between $63,000 and $81,500. This valuation was not for liquidation purposes or in the context of a bankruptcy case. Although he stated on re-direct that goodwill was not figured into his estimate as to value, on cross-examination he clearly stated that his appraisal was based on a sale of the business as a "going concern".

On the other hand, the bank's appraiser, upon whom the defendant relies, valued the property for liquidation purposes. In his opinion the IGA store would cost $75,600 to replace, but because of "lack of parking, lack of vacant land for septic system and well, [and] functional obsolescence", that valuation had to be depreciated 60%, yielding an actual market value of only $30,240. To that, the value of the raw land must be

added. Since he valued the raw land for both buildings at $10,000, and since we are applying an 84.5% allocation, we will assume that the raw land attributable to the IGA store was worth $8,450. Thus, it appears that the defendant's appraiser fixed the value of the land and building attributable to the IGA store at $38,690. As noted above, this testimony was substantially impeached on cross-examination, as well as rebutted by the testimony of others. The question of parking was rebutted by the testimony of the plaintiffs' son who helped his parents in the business. He testified that there was a problem at one time only with respect to parking and that was when the city-owned parking lot next to the store was closed for a short time. Although the property owned by the plaintiffs did not have sufficient parking, the city-owned lot was usually available, and provided more than adequate space for the store's needs. Likewise, he stated that the septic system and well were adequate for use in a grocery store. The defendant's appraiser's view was that because the property lacked a sufficient septic system and well, it could never be marketed as anything other than a grocery store, because restaurants, beauty parlors, and other such businesses require larger quantities of water. The fact that the property could not be marketed broadly, he felt, limited the price available in the marketplace. When pushed on cross-examination, the witness estimated that if the parking, septic system and well were adequate, he would still depreciate the property 25%, and thus find that the value of the building was $56,700. When this sum is added to the $8,450 value of the land, one would arrive at a figure of $65,-150 for the IGA store and building. In essence, in his $38,690 appraisal, the witness appraised the property as a vacant

---

8. For most of the first year, (November 1975 through June 1976) the debtors occupied the store as lessees.

9. The statement of affairs filed by the debtors showed that in 1979, a year before Mr. Reich's ill health commenced, the debtors earned only $6,000 from their business; the same amount was withdrawn in 1980. These minimal withdrawals were made at a time when the business was accumulating trade debts of approximately $39,000. In short, it is clear that the business was a great money loser.

10. This was their price for the land and buildings only; they asked $262,000 for the entire business.

building and not as a grocery store. The plaintiffs find fault with this method as they argue the property was indeed a grocery store, and if it could have been sold as a grocery store, it would have yielded the $65,150 price, which would have been sufficient to pay them their exempt equity.

We are cognizant of the extremely poor economic conditions suffered by the nation and this state in general and by northern Michigan in particular during the bleak days of 1981 and 1982. Indeed, unemployment rates exceeding 30% were commonplace in the northeastern counties of Michigan at that time. We are cognizant also that property was difficult, if not impossible, to market at that time. This was especially so with respect to income producing property in locations such as this where there are more critters than people. Appraisals are nothing but educated guesses as to what a reasonable buyer would pay a reasonable seller for a specific property at a specific point in time. We must look not only at what people think a property should have sold for, but also to what actually happened when sale was attempted. What we see is that a property was marketed for an entire year without a single offer of purchase at any price. The only prospective purchaser who testified stated that he would have offered $50,000 for the property but that the trustee's asking price of $100,000 scared him off. Since the trustee was offering both properties for sale for $100,000, and since we are utilizing a formula which allocates 84.5% of the fair market value of the combined Dairy Mart and IGA properties to the IGA store, we will consider that the purchaser would have offered $42,250 for the IGA store and underlying property alone and that the trustee's asking price for that property alone was $84,500. From this we can determine that the IGA property was worth more than $42,250, since a seller would not have accepted that price, but that it was not worth as much as $84,500, since that asking price elicited no interest in prospective buyers. Furthermore, we find the following valuation continuum: the earliest relevant valuation was the debtors' original

asking price for the IGA store property of $135,200, which valuation dropped to $126,750 when scheduled by the plaintiffs in their bankruptcy in July, 1981; which dropped to an asking price of $84,500 by the trustee; which dropped to $83,500 based upon the maximum valuation given by the plaintiff's expert witness; which dropped to $65,150 per the plaintiffs' best slant on the defendant's expert witness' testimony; which dropped to $63,000 based upon the plaintiffs' own expert witness' lowest estimate of fair market value; which dropped finally to the defendant's expert witness' estimate of fair market value of $38,690. That is quite a long drop in value in only one year. Such a precipitous decline in theoretical valuations reflects the actual decline of market prices in Michigan during the depths of our recent depression. When there are no buyers, market values can find no floor.

The expert opinions as to the value of the IGA property thus stretch from $38,690 on the low side to $81,500 on the high side. The facts, however, show that the store was purchased less than six years earlier for a price of approximately $67,600, that the purchase price may have proved too high since the business apparently lost money, that economic and real estate conditions had deteriorated markedly between 1976 and 1981–1982, that no material improvements were made to the property in that time and that a concerted effort to sell the property for one year yielded no offers at any price. In our opinion, the facts speak more cogently than do the opinions of experts, especially where, as here, the opinions vary so greatly. Consequently, by following the facts, we are led inexorably to favor a lower value than the median between the two expert opinions. We find that the IGA store, the land underlying it and its portion of the land surrounding it was worth $45,500 immediately before the roof collapsed. The value of the Dairy Mart and its share of the land was appraised only by the defendant's expert. His calculation when the allocation formula is utilized was that that property had a fair

market value of $9,866 ($8,316 for the building and $1,550 for the land). Thus, the total value of all of the real property was $55,366 when the roof collapsed on the IGA.

Had the trustee been able to sell the property at that price (and we realize he would have had no incentive to do so, since after the bank's lien and the debtors' exemption are deducted, the estate would have received nothing) or had he timely abandoned the property before the loss occurred so that the debtors could have recovered its possession and control of, and marketing responsibility for, the property, the cost of sale, (including realtor's commissions) likely would have been at least 10%. Thus, the net loss occasioned by the defendant's negligence must be calculated as follows:

| | |
|---|---|
| $55,366.00 | fair market value of the property |
| x 90% | |
| $49,829.40 | net after sale |
| −47,000.00 | prior encumbrance to Cheboygan Bank |
| $ 2,829.40 | loss suffered by the plaintiffs |

Therefore, we find that the defendant's breach of his duty to the plaintiffs to exercise due care to preserve the IGA store was the proximate cause of the collapse of that building which damaged the plaintiffs to the extent of $2,829.40. A judgment for the plaintiffs and against the defendant in his official capacity in that amount will, therefore, be entered.

## IS THE SURETY LIABLE TO THE PLAINTIFFS FOR THE TRUSTEE'S NEGLIGENT FAILURE TO PERFORM HIS DUTIES?

The plaintiffs joined Travelers Indemnity Company as a defendant, jointly and severally, with the trustee. The bond in effect at the time of the loss in question, issued in favor of the United States of America in the amount of $50,000 per trustee in this judicial district was conditioned, in pertinent part, as follows:

NOW, THEREFORE, if said Principals, as Interim Trustee and/or Trustee, shall obey such orders as the United States District Court or any of the Bankruptcy Judges or United States Trustees of such Court may make in relation to the trust assumed by said Interim Trustee and/or Trustee in cases in which he has been or will be appointed, and shall faithfully and truly account for all monies, assets, and effects of such estates as shall come into his hands and possession, *and shall in all respects faithfully perform all his official duties as Interim Trustee and/or Trustee*, then this obligation to be void, otherwise to remain in full force and effect.

(Emphasis added).

It is apparently a matter of folklore that the bond required of all trustees is a fidelity bond which does not cover the errors or omissions of the trustees. Legend has it that if a trustee merely fails to do his duty (as opposed to if he absconds with the estate's funds), there can be no claim on the bond. Although we have diligently searched for some support for this proposition, we could find none other than this possibly self-serving unsupported statement found in 1985 *Collier Handbook for Trustees and Debtors in Possession*, ¶ 4.05[3][A]: "The bond covers faithful performance, to-wit, honesty by the trustee in the performance of his official duties". Consequently, as there appears no basis for doing otherwise, our task is to merely read the bond and construe its terms.

The plaintiffs maintain that the surety is liable on this bond because the principal, i.e., the trustee, failed to "faithfully perform all his official duties." They correctly argue that one who "negligently" performs an official duty does not "faithfully" perform it. Therefore, since the trustee did not "faithfully perform all his official duties", in that he failed to preserve an asset in his custody, *Carson, Pirie, Scott & Co. v. Turner, supra,* 61 F.2d at 694, the bond's liability is activated. This reading of the purpose of the bond is supported by *Hartford Accident & Indemnity Co. v. Crow, supra,* where, as indicated earlier, a judgment of liability against the bankruptcy receiver's surety for the receiver's negligent failure to insure property in his custo-

dy was affirmed. Therefore, judgment against Travelers Indemnity Company jointly and severally with defendant James Burke, shall enter in favor of the plaintiffs in the amount of $2,829.40.[11]

**11.** Besides misreading controlling precedent, *Sherr* makes little sense from a practical standpoint. Assuming that the trustee cannot be held personally liable but only officially liable for his negligence, the ultimate effect will frequently be that the trustee will nevertheless personally bear the loss. Where, as here, the estate lacks sufficient funds to pay the judgment in full, the surety will be required to pay the deficiency. Since the trustee is contractually bound to indemnify the surety against any loss paid on his account, in the end the trustee still pays.

This case is a good illustration. Here, the trustee's most recent report shows that he has collected $4,255.01 during his administration. Against this, administrative expenses of $1,560 have already been allowed. His attorney has tried this case to completion and presumably will shortly request and have allowed compensation of at least another $600. Even if the trustee were to waive his statutory fee or have it disallowed, there will still be allowed adminis-

trative expenses of at least $2,160, not including the plaintiffs' judgment of $2,829.40. When all administrative expenses, including the plaintiffs' judgment are totalled, they will exceed by at least $734.39 ($2,160 + $2,829.40 = $4,989.40 – $4,255.01 = $734.39), the cash which entered the estate. Therefore, a pro-ration will occur at the time of distribution. As the plaintiffs possess, under this hypothesis, 56.7% of the allowed administrative claims ($2,829.40 ÷ 4,989.40 = 56.7%), they would receive a distribution from the estate of $2,412.94 ($4,255.01 × 56.7% = $2,412.94), leaving them with a $416.46 deficiency ($2,829.40 – $2,412.94 = $416.46). The surety will be called upon to contribute this amount in order to make the plaintiffs whole. It will then undoubtedly call upon Mr. Burke to personally indemnify it in this amount. If he fails or refuses, it may sue him therefor. Such circuity of action has nothing to commend it. Thus, both in legal theory and in practical effect, the *Sherr* formula is flawed.