**In re Ronald D. WALKINGTON,**
**Debtor.**

**Ronald D. WALKINGTON, Plaintiff,**

**v.**

**PRODUCTION CREDIT ASSOCIATION,**
**Defendant.**

**In re John ANGLIN, Debtor.**

**John ANGLIN, Plaintiff,**

**v.**

**HOUSEHOLD FINANCE**
**CORPORATION,**
**Defendant.**

**Bankruptcy Nos. HG 83 1133, HK 83 2155.**

**Adv. Nos. H 84 0008, H 83 19.**

United States Bankruptcy Court,
W.D. Michigan.

June 15, 1984.

Roland F. Rhead, Lansing, Mich., for debtor/plaintiff Walkington.

Peter A. Teholiz, Lansing, Mich., for defendant Production Credit Ass'n.

Daryl J. Mumford, Battle Creek, Mich., for debtor/plaintiff Anglin.

Robert J. Moser, Kalamazoo, Mich., for defendant Household Finance Corp.

## OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

### Novation of Loan and Security Agreements

### Tool of the Trade Exemption and Lien Avoidance

### Applicability of § 522(d)(5) Exemptions For Purpose of Lien Avoidance

Both cases presently before the Court for decision raise the same issues as to what constitutes a tool of the debtor's trade under § 522(f)(2)(B) and the applicability of the "spillover" exemption under § 522(d)(5) for the purpose of lien avoidance under the Bankruptcy Code.

*In re Anglin:* On April 29, 1980, John Anglin, debtor herein, procured a loan from Credithrift of America in the amount of $2,107.66 with a finance charge of $700.34. Various items of household goods and appliances as well as a Hammond organ and two speakers served as collateral for this loan. Approximately one year later, the debtor obtained a second loan from Credithrift of America in the amount of $2,520.26 with a finance charge of $729.90. This loan was used to purchase an automobile and to pay off the remainder of the prior loan. The identical list of collateral under the first loan, as well as a 1974 Pinto, served as security for the second loan. Subsequently, Credithrift of America assigned the 1981 loan document to Household Finance Corporation ("HFC"), defendant herein.

On August 23, 1983, Mr. Anglin filed a petition under Chapter 7 of the Bankruptcy Code. HFC filed a claim as a secured creditor in the amount of $1,065. Testimony at a hearing held on this matter on December 9, 1983, established the approximate value of the organ and speaker cabinet at $1,600. (Tr. at 6) The debtor claimed a $750 exemption in these items under § 522(d)(6) and a "spillover" exemption in the amount of $850 pursuant to § 522(d)(5). The household goods and appliances were claimed as exempt under § 522(d)(3) and likewise a "spillover" exemption in the amount of $1,400 was claimed on them. The debtor seeks to avoid the defendant's lien on the Hammond organ and speaker cabinet under § 522(f)(2)(B) as tools of his trade as a musician and the remaining collateral under § 522(f)(2)(A).

*In re Walkington:* The debtor, Ronald Walkington, ran a dairy operation of approximately 75 cows. Commencing in 1977, the debtor borrowed money from Production Credit Association of Lansing

("PCA"). The first security agreement between the parties dated April 15, 1977, described collateral securing the debt as "all livestock now owned or hereafter acquired by Debtor, and the young of all livestock." In the second security agreement dated December 22, 1980, "all livestock and poultry and [their] young ..." served as collateral.[1]

On August 19, 1981, the parties entered into a "Basic Loan Agreement" covering all prior loans between the parties and replacing any earlier loan agreements. Subsequently, three "Supplemental Loan Agreements" were executed under the "Basic Loan Agreement," each such agreement wholly replacing the previous one.

■ On April 28, 1983, the debtor filed a petition under Chapter 11 of the Bankruptcy Code which was voluntarily converted to Chapter 7 on January 17, 1984. The same day the debtor filed an application to set aside PCA's lien as a tool of his trade under § 522(f)(2)(B) on 26 specific cattle in the amount of $6,100. The debtor claimed exemptions on these cattle under the "spillover" exemption of § 522(d)(5).[2]

In both of the above cases the creditors admit that their liens are nonpossessory and nonpurchase money. However, they contest whether their collateral can properly be labelled tools of the debtors' trade and whether the general exemption of § 522(d)(5) can be utilized for lien avoidance purposes. Additionally, PCA claims that it's lien predated the enactment and effective date of the Bankruptcy Code and therefore § 522(f) cannot apply. After considering oral argument and briefs submitted by the parties, the Court makes the following conclusions of law:

1. The parties executed a third security agreement on March 23, 1982, granting PCA a purchase money security interest in "20 Hd Holstein cows" but it has been stipulated that the debtor does not seek lien avoidance in any of the purchase money cattle and therefore the third security interest is not of consequence for the purpose of this proceeding.

2. It appears that the debtor argues in the alternative that his cows are "animals" under the

**I. DID THE PARTIES IN THE WALKINGTON CASE INTEND TO CREATE A NEW LOAN AND NEW SECURITY INTEREST SUCH AS TO CONSTITUTE A NOVATION POST-ENACTMENT DATE OF THE BANKRUPTCY CODE PERMITTING THE APPLICATION OF 11 U.S.C. § 522(f)?**

■ PCA asserts that it's security interest in Mr. Walkington's dairy cows predates the enactment date of the Bankruptcy Code such that § 522(f) is inapplicable as to its collateral pursuant to the Supreme Court decision in *U.S. v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). This Court has previously addressed this issue. In *In re Hitts*, 21 B.R. 158 (Bankr.W.D.Mich.1982), the parties entered into a series of refinancing of prior loan agreements commencing in March, 1974, with a new security agreement being signed for each new loan. This Court focused on the intention of the parties to create a new debt and a new security interest which superseded earlier agreements to find that the final agreement, entered into subsequent to the effective date of the Code, constituted a novation and therefore § 522(f) was applicable.

The "Basic Loan Agreement" executed between Mr. Walkington and PCA on August 19, 1981, clearly created a new loan agreement superseding all prior loans. Section 2.0 of that agreement provides:

Unless otherwise agreed in writing: this Agreement covers all loan applications, loans, and indebtedness pending or outstanding between the parties at the date hereof ... and it amends and replaces any earlier loan agreements outstanding

language of § 522(d)(3) and liens on them are avoidable pursuant to § 522(f)(2)(A). The Court cannot accept such a liberal construction since these cattle are not held "primarily for the personal, family, or household use of the debtor or dependent of the debtor" as required by this section. Unlike other household animals or pets the debtor's cows are held primarily for commercial purposes.

between the parties so that no further reference to any such earlier agreement is necessary....

■ Further, the Court finds that the security agreement dated December 22, 1980, superseded the previous security agreement executed prior to enactment of the Bankruptcy Code. The security agreement dated December 22, 1980, secures "the payment and performance by Debtor of all Debtor's obligations. 'Obligations' shall mean (a) all loans, advances, liabilities, and amounts owing by Debtor to PCA at any time, whether representing existing or future credit...." This security agreement does not make reference to any prior security agreement nor state that it's merely an extension or renewal of a preexisting agreement. The list of collateral is more inclusive than that in the previous security agreement and as its predecessor covers all livestock and their young. A new financing statement was filed by PCA at the Ionia County Register of Deeds on January 8, 1981, to perfect its December, 1980, security interest. To the extent that there is any ambiguity as to the survival of previous security agreements, the Court notes it is a fundamental principle of construction that documents are construed against their drafter.[3] Here all documents are standard, printed forms supplied by PCA. Clearly, in the absence of bankruptcy, PCA would seek enforcement of the 1980 security agreement rather than the 1977 security agreement.[4] Indeed, when the debtor became delinquent in his payment under supplemental loans pursuant to the "Basic Loan Agreement," PCA commenced an action in the Circuit Court for the County of

Ionia to foreclose on collateral under the 1980 agreement, no mention being made of the 1977 agreement.

The case of *In re Cook*, 19 B.R. 942 (Bankr.D.Colo.1982), cited by PCA is inapposite. In that case the parties entered into a loan and security agreement with a future advance clause on July 24, 1979. Subsequently, additional funds were extended after the effective date of the Code. The Court found that this additional loan, however characterized, did not change the date of the creditor's security interest. The Court stressed that no new security interest was procured after the effective date of the Bankruptcy Code[5] but rather the 1979 agreement continued by the explicit terms of the parties subsequent loan agreement.

Since the "Basic Loan Agreement" and the 1980 security agreement constitute a novation[6] of the parties prior agreements after the effective date of the Bankruptcy Code, the lien avoidance provisions of the Code are clearly applicable in this case.

## II. ARE THE ITEMS OF COLLATERAL IN WHICH THE DEBTORS ATTEMPT TO AVOID LIENS TOOLS OF THEIR RESPECTIVE TRADES?

■ The secured creditors in both the *Anglin* and *Walkington* cases have raised an issue concerning the definition and scope of the phrase "tools of the trade of the debtor" as it is used in § 522(f)(2)(B). Neither the Code nor the legislative history defines this phrase. It is the view of this

---

3. "[I]n case of doubt or ambiguity a contract will be construed most strongly against the party who drew or prepared it, or whose attorney drew or prepared it." 17 Am Jur 2d, Contracts § 276 at 690. (1983).

4. *See In re Schneider*, 18 B.R. 274, 8 B.C.D. 1084, 1085 (Bankr.D.N.D.1982) ("The prior debt having been extinguished, Beneficial's security interest ceased to exist. It is the new note and security interest created on February 27, 1979, that Beneficial would be entitled to enforce were it not for the filing of the Debtor's bankruptcy petition.")

5. The Court went on to hold that § 522(f) could not constitutionally be applied during the period between the enactment date (November 6, 1978) and the effective date (October 1, 1979) of the Bankruptcy Code, the so-called "gap period."

6. Under Michigan law, "[w]here a creditor accepts from his debtor any form of new agreement in place of a prior contract or obligation between them, with the intent to cancel the former and to substitute the new one therefor, novation by the substitution of an obligation takes place." 18 M.P.L. Novation § 2 (1983).

Court that Congress intended it to have a common sense interpretation on a case-by-case basis with the key inquiry focusing on the necessity of an item to the individual debtor's particular business or employment.

John Anglin is a musician who has been playing at parties, wedding receptions and other social gatherings for the past 20 years. (Tr. at 3, 7) In the last six month period he has averaged playing as a musician twice a week. (Tr. at 7) On all such occasions he uses a Hammond organ and Leslie Tone Cabinet which is an external type of speaker necessary for his organ to produce sound. (Tr. at 7, 8) During the past five years Mr. Anglin has had various other jobs and is currently employed as a salesman for Midwest Business Exchange averaging roughly 25–30 hours per week in this capacity. (Tr. at 3, 7) He has testified that two-thirds of his earnings derive from his musical pursuits and without this source of income he would be unable to meet child support payments for his two children. (Tr. 3, 4)

Donald Walkington has been a dairy farmer for at least the past seven years and there is no evidence that he has had other employment. The 26 cattle on which he attempts to avoid PCA's lien are utilized for dairy and breeding purposes. PCA admits that these cattle "have been an integral part of [the debtor's] commercial dairy operation which he has run since 1977." (PCA's Brief at 3) Reports filed in the debtor's Chapter 11 proceeding indicate that the sole source of his revenue is from the sale of milk.

The Court finds that the Hammond organ and speaker cabinet constitute tools of Mr. Anglin's trade as a musician. Both items of collateral are reasonably necessary, indeed essential, for the debtor to perform in his chosen craft. The fact that a debtor engages in additional employment to supplement his primary source of income should not affect his right to claim items necessary to his primary employment[7] as exemptable "tools of his trade" upon which he may avoid liens.

Likewise, the 26 head of cattle are necessary tools of Mr. Walkington's trade as a dairy farmer. While cattle are not generally considered a "tool" in common parlance, nevertheless "the description of an object as a 'tool' necessarily implies a classification based upon that object's functional and utilitarian purpose in the hands of its owner or user." *In re Dubrock*, 5 B.R. 353, 6 B.C.D. 771, 772 (Bankr.W.D.Ky. 1980). Thus, breeding horses may properly be found tools of the debtor's trade as a horse breeder. *See In re Hunter*, No. NK 80–03561 (Bankr.W.D.Mich.1981). Congress did not place any limit on the kinds of property that may constitute a "tool" since to do so would unfairly discriminate against particular professions and undermine the fresh start policy that the Code seeks to promote.

III. IS THE "SPILLOVER" EXEMPTION OF 11 U.S.C. § 522(d)(5) AVAILABLE TO A DEBTOR FOR THE PURPOSE OF LIEN AVOIDANCE UNDER 11 U.S.C. § 522(f)?

Having found that the items of collateral here in question are tools of the respective

---

7. The Court notes that Mr. Anglin listed his occupation as a musician on his bankruptcy schedule and there is no evidence indicating that Mr. Anglin had intended to make his position as a salesman his primary occupation.

A new business, embarked in as an experiment merely, might temporarily produce more, and require more personal attention, than the old, and yet the latter be one's principal occupation because most relied on or looked to for a livelihood, and the one that would be held on to if compelled to abandon either.

*In re Samuel*, 36 B.R. 312, 11 B.C.D. 444, 446 (Bankr.E.D.Va.1984), *quoting Smalley v. Masten*, 8 Mich. 529, 531 (1868). Despite the fact that the debtor devotes less time to his musical career than to his occupation as a salesman, the Court believes that Mr. Anglin's primary occupation is that of a musician. Thus, it is unnecessary for this Court to determine at this time whether an individual debtor may claim more than one occupation for the purpose of claiming exemptions in tools of his trade under 11 U.S.C. § 522(d)(6).

trades of the debtors, they are properly exemptable under § 522(d)(6) to the extent of $750. Having utilized their specific § 522(d)(6) exemption in full, both debtors have claimed exemptions of their "tools" under § 522(d)(5) to the extent of their unused homestead exemption under § 522(d)(1) plus $400.[8] Both HFC and PCA admit that their security interests are nonpossessory and nonpurchase money. However, they claim that Congress did not intend that the general exemption of § 522(d)(5) could be used for lien avoidance purposes.

Courts which have held that lien avoidance under § 522(f)(2) is strictly limited to the specific exemptions under § 522(d)[9] rely on various arguments to support their conclusion. First, they cite legislative history[10] and find that "§ 522(f) should apply to certain limited categories of personal property which are necessities of family life and have little if any resale value from the creditor's standpoint, but have a relatively high replacement cost so far as the debtor is concerned." *In re Sweeney,* 7 B.R. 814, 818 (Bankr.E.D.Wis.1980). Other courts have extended the "nominal resale value" standard to the debtor's exemption and lien avoidance in tools of his trade.

*See In re O'Neal,* 20 B.R. 13 (Bankr.E.D. Mo.1982) (Section 522(f)(2) does not allow avoidance of a security interest in tractors, sprayers, trailers and other farm implements of high value.); *In re Yparrea,* 16 B.R. 33 (Bankr.D.N.M.1981) ("Tools of the trade" exemption did not include farm machinery which was large in size and valued at approximately $30,000.) Second, they warn that a broad interpretation of § 522(f) will pose "grave Fifth Amendment Constitutional questions" since unlike the exemption provision, the right to avoid liens affects property rights of secured creditors. *See In re O'Neal, supra* at 16; *In re Hunter, supra* at 6. Third, they find a correlation between the language of § 522(f)(2) and the specific exemptions permitted by § 522(d)(3), (4), (6) and (9). *See In re Sweeney, supra* at 818; *In re Tofstad,* 19 B.R. 34, 9 B.C.D. 317, 318 (Bankr.D. N.D.1982). Lastly, they fear that a broad view of § 522(f)(2) would seriously undermine financing to select groups. *See In re Yparrea, supra* at 35. ("If liens are to be avoided upon [expensive farm machinery], it is obvious that such property will soon have no use as collateral for any loan. Absent very clear directions, Congress' action should not have been interpreted as

---

**8.** Neither debtor has claimed a homestead exemption under § 522(d)(1). Mr. Anglin relies on § 522(d)(5) with respect to the lien of HFC to the extent of $850, approximately half the value of his Hammond organ and speaker cabinet; Mr. Walkington relies on § 522(d)(5) with respect to the lien of PCA to the extent of $6,100, the full value of the 26 head of cattle.

**9.** *See In re Sweeney,* 7 B.R. 814 (Bankr.E.D.Wis. 1980); *In re Hunter,* No. NK 80 03561 (Bankr.W. D.Mich.1981).

**10.** Legislative history provides:
> In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor's hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors' true intentions, are coerced into payments they simply cannot afford to make.
> The exemption provision allows the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed, to

> undo the consequences of a contract of adhesion signed in ignorance, by permitting the invalidation of nonpurchase money security interests in household goods. Such security interests have too often been used by overreaching creditors. The bill eliminates any unfair advantage creditors have....
> In consumer cases, very often a secured creditor with a security interest in all of the debtor's property, including household and personal goods, uses the threat of foreclosure to obtain a reaffirmation of a debt. Otherwise, the secured creditor is able to deprive a debtor of even the most insignificant household effects, including furniture, cooking utensils, and clothing, even though the items have little if any realizable market value. However, the goods do have a high replacement cost, and thus the creditor is able to use the threat of repossession, rarely carried out, to extract more than he would be able to if he did foreclose or repossess.
> H.Rep. No. 95–595, 95th Cong., 2nd Sess. 127 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 6088.

intending to shut off farmers and ranchers from needed operating loans."); *In re O'Neal, supra* at 16–17; *In re Hunter, supra* at 6.

 While there may be some legitimate reasons for narrowing the scope of lien avoidance under the Bankruptcy Code, this Court cannot reach the same conclusion as the above cited cases. The starting point of our analysis must be the language of § 522(f). This section provides:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property *to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section,* if such lien is—

(1) a judicial lien; or

(2) a nonpossessory, nonpurchase-money security interest in any—

(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family or household use of the debtor or a dependent of the debtor;

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor. (emphasis added)

It must be presumed that Congress meant what it has enacted. The legislative history states that a debtor may avoid a lien "to the extent that the property could have been exempted in the absence of the lien." H.Rep. No. 95–595, 95th Cong., 1st Sess. 362 (1977), U.S.Code Cong. & Admin.News 1978, 6318. Absent the liens, it is clear that Mr. Anglin and Mr. Walkington were properly entitled to claim an exemption under § 522(d)(5) to the extent of $400 plus any unused portion of the § 522(d)(1) ex-

emption. Further, "the unused portion of Section 522(d)(1) [is] applicable *to any property of the estate without ... limitation." In re Brock,* 10 B.R. 67 (Bankr.W. D.Mich.1981). (emphasis added) This Court can find no basis for holding that Congress intended the § 522(d)(5) exemption to be treated differently than the other exemption provisions.

In *In the Matter of Augustine,* 5 C.B.C. 542 (W.D.Pa.1981), the district court affirmed a bankruptcy court's determination that the avoidance power under § 522(f) could be applied only to the extent of the specific $750 "tool of the trade" exemption without mentioning § 522(d)(5). In reversing, the Third Circuit stated:

It is not the function of this court to question why Congress chose to permit debtors to avoid the particular liens enumerated in Subsection (f). We must assume that Congress understood that the language of that subsection—that the debtor may avoid a lien on property "to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section"—compels the result that Subsection (d)(5) exemptions may be applied to the kinds of property subject to lien avoidance under Subsection (f). Nothing in Section 522 suggest a distinction that would prohibit aggregation for purposes of lien avoidance while permitting it for exemption purposes.

*Augustine v. United States,* 6 C.B.C. 1053, 1058 (3rd Cir.1982).

The Court is not convinced that the legislative history relied upon by the *Sweeney* Court compels lien avoidance in property of only nominal resale value. While the impetus in legislating § 522(f) may have been a concern about the "overreaching creditor" with a security interest in household goods,[11] Congress was also concerned with the broader policy of protecting a debtor's fresh start.[12] The legislative history cited

11. *See* n. 10, *supra.*

12. Legislative history to § 522(f) provides, "[s]ubsection (f) protects the debtor's exemp-

tions, his discharge and thus his fresh start by permitting him to avoid certain liens on exempt property." H.Rep. No. 95–595, 95th Cong., 1st

in *Sweeney* only makes reference to household and personal goods, yet Congress saw it appropriate to permit lien avoidance in tools of the debtor's trade. Obviously, "Congress could not ·have been unaware that such tools might well be more expensive than ordinary household goods." *Augustine v. United States, supra* at 1057. Congress has also provided for avoidance of liens in professionally prescribed health aids for the debtor or his dependent *without any monetary limitation whatsoever.* §§ 522(f)(2)(C), 522(d)(9).

■ This Court is also not convinced that allowing the "spillover" exemption of § 522(d)(5) for lien avoidance purposes would render § 522(f) an unconstitutional taking under the Fifth Amendment. Unlike the secured creditor in *U.S. v. Security Industrial Bank, supra,* both HFC and PCA had notice of the novel lien avoidance provision of the Bankruptcy Code before they acquired their security interests. The lien avoidance provision for our purposes is limited both as to the kinds of property subject thereto and as to a specific dollar maximum. Further, avoidance of a lien does not destroy the underlying debt but rather changes the status of a creditor from a secured to an unsecured position. Finally, while "takings analysis is not necessarily limited to outright acquisitions by the government for itself," *U.S. v. Security Industrial Bank, supra,* 103 S.Ct. at 412, I question whether any alleged taking here is for a public purpose rather than merely a rearrangement of private contractual rights. *See U.S. v. Security Industrial Bank, supra* (J. Blackmun, concurring). (Reaching the constitutional issue, J. Blackmun stated, "Congress … [by enacting § 522(f)] has not taken for the government's use *or for public purpose …*") (emphasis added). *See also In re Eagan,* 8 B.C.D. 762, 765–66 (Bankr.N.D.N.Y.1982).

The fact that the types of property Congress specified may be subject to lien avoidance under § 522(f)(2) directly correlate to specific exemptions under § 522(d) does not establish that Congress intended to exclude the "spillover" exemption from the debtor's lien avoidance power. "If Congress intended that the debtor's exemption in this circumstance should be limited, I believe it would have clearly expressed such intention." *In re Eagan, supra* at 767. *See also In re Dipalma,* 24 B.R. 385, 9 B.C.D. 1131, 1134 (Bankr.D.Mass.1982).

■ Lastly, this Court is not aware of any study which would tend to indicate that the broad interpretation urged by the debtors herein would unduly hinder financing to select professions. Nevertheless, counterbalancing various policy considerations and their implications clearly appears to be a legislative, not judicial, function.

While the result of *Sweeney, supra* may have some appeal, it is a minority position, *Augustine v. United States, supra; In re Metzig,* 33 B.R. 620, 11 B.C.D. 77 (Bankr.N.D.Tex.1983); *In re Dipalma, supra; In re Dillon,* 18 B.R. 252 (Bankr.E.D.Cal.1982); *In re Eagan, supra; In re Reed,* 18 B.R. 1009, 8 B.C.D. 1194 at n. 3 (Bankr.W.D.Ky.1982), that finds little or no support in the language of the Code or in the legislative history. The liberal interpretation regarding the claiming of exemptions, the structure of § 522(f) and the protection of a debtor's fresh start convince this Court that Congress did not intend, and surely did not draft into the Code, an absolute prohibition of a § 522(d)(5) exemption for purposes of § 522(f)(2) lien avoidance. If change is deemed necessary, the answer lies in the halls of Congress or in the state legislatures,[13] not by way of judicial legislation.

---

Sess. 362 (1977), U.S.Code Cong. & Admin.News 1978, 6318.

**13.** 11 U.S.C. § 522(b)(1) permits states to opt out of the federal § 522(d) exemption system. States are therefore free to deny a debtor any "spillover" or general exemption and to limit a debtor's tool of the trade exemption, if any, to a

nominal amount. For example, the Court in *In re Dubrock,* 5 B.R. 353, 6 B.C.D. 771, 773 (Bankr.W.D.Ky.1980) states:

We note by way of *obiter* that the exemption schedule provided in 11 U.S.C. § 522(d) is no longer available to persons filing in this state. The General Assembly of the Commonwealth of Kentucky has made mandatory the applica-

Accordingly, both debtors herein may avoid the liens of their respective secured creditors in full as requested.

tion in bankruptcy of Kentucky's exemption provisions.

Like the federal exemption, Kentucky allows an exemption for "the tools of any individual debtor necessary in his trade." Unlike the federal statute, Kentucky's tools-of-trade pro-vision only allows a $300 exemption. Further, although there is a general exemption allowance of $1,000, there is no "spill-over" of the unused portion of the state homestead exemption. (emphasis in original deleted).