In re Donald J. FALCONER and Connie Catherine Falconer, Debtors.

UNITED BANK OF MICHIGAN,
Defendant–Appellant,

v.

Donald J. FALCONER and Connie Catherine Falconer, Plaintiffs–Appellees.

No. G87–254.

United States District Court,
W.D. Michigan.

Oct. 15, 1987.

Clary, Nantz, Wood, Hoffius, Rankin & Cooper by Harold E. Nelson, Grand Rapids, Mich., for plaintiffs-appellees.

Edward Reed Barton, Allegan, Mich., for defendant-appellant.

## OPINION

ENSLEN, District Judge.

*Facts*

The debtors, Donald and Connie Falconer, owned and operated a dairy farm near Hastings, Michigan. Their primary source of financing was the appellant, United Bank of Michigan (then known as United Community Bank and hereinafter referred to as the "Bank" or "United Bank"). The debtors filed a petition for relief under the reorganization provisions of Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101, *et seq.*) on October 23, 1983. At that time, they were indebted to the Bank in the approximate amount of $425,000. The debt was entirely secured by liens on the debtors' farming equipment and machinery, livestock, feed on hand, growing and harvested crops and certain real estate owned by the debtors. (See Transcript of June 5, 1984 hearing in this matter, pages 11–12, 28, 32–33 and 49, hereinafter referred to as "1984 Tr."). The Bank essentially had a lien upon all of the debtors' assets. In November of 1983, less than a month after the debtors filed their petition, United

Bank valued its collateral in their hands at $439,000 (1984 Tr. 60–62).

The debtors continued to operate their farm after filing their bankruptcy petition as debtors in possession of their bankruptcy estate. In order to operate the farm they needed to use the feed they had on hand to feed their cattle and to use some of the proceeds from the sale of the cows' milk to keep the farm running. Since the feed, the cows, the milk and its proceeds were all part of the Bank's collateral (1984 Tr. 49), the debtors sought the Bankruptcy Court's permission to use these resources for the farm's operating expenses. This use of the Bank's collateral is known as the use of "cash collateral," and is typically accompanied by an obligation to make "adequate protection" payments to compensate the creditor whose security is being depleted by the use of cash collateral. On June 13, 1984, the debtors were ordered to make monthly adequate protection payments to the Bank in the amount of $6,600.00 out of the proceeds of their milk sales.

In October of 1984, pursuant to the debtors' request, the Bankruptcy Court authorized them to sell up to thirty (30) cows for at least $1,000 each. At an auction sale held on November 13, 1984, however, the debtors sold thirty-seven (37) cows for less than $500 per head. Primarily as a result of the depletion in the Bank's security resulting from this sale in violation of the court's order, the Bankruptcy Court granted the Bank a "super-priority" claim under § 507(b) of the Bankruptcy Code (11 U.S.C. § 507(b)) in the amount of $21,213.35 on March 27, 1985. To the extent of its superpriority claim, the Bank stands in front of all other claimants to non-exempt property of the debtors' bankruptcy estate.

In the months following June of 1984, the debtors apparently failed to keep up with their obligation to make adequate protection payments to the Bank. When on March 18, 1985, the debtors announced the liquidation of their dairy operation, they were nearly $30,000 in arrears with respect to the payments. By the time the debtors converted their bankruptcy to a proceeding under the liquidation provisions of Chapter

7 of the Bankruptcy Code (11 U.S.C. § 701 et seq.) on February 19, 1986, it appears that few assets remained in the bankruptcy estate.

When the debtors originally filed their petition in bankruptcy, they claimed certain property as exempt under § 522(d) of the Bankruptcy Code. This section permits debtors to exclude certain described assets from the reach of their creditors, to the extent of limited dollar amounts. It is designed to provide debtors with a "fresh start" when they emerge from bankruptcy proceedings. After they converted to proceedings under Chapter 7 of the Bankruptcy Code, the debtors sought to amend their requested exemptions under § 522(d) and to avoid the Bank's liens therein pursuant to § 522(f) of the Bankruptcy Code. The language and intent of these provisions are at issue. After a hearing on January 5, 1987, the Bankruptcy Court granted the debtors the relief they sought, giving rise to this appeal. That court allowed the debtors to amend their exemptions and further permitted them to avoid the Bank's liens in all property claimed as exempt, including large items of farming equipment claimed as exempt under § 522(d)(5) of the Bankruptcy Code.

There are really two issues presented on appeal:

1. Whether the Bankruptcy Court properly allowed the debtors to avoid the bank's liens in certain heavy farming equipment under § 522(f) of the Bankruptcy Code by allowing the application of exemptions claimed under the so-called "spillover" provision of § 522(d)(5) to the lien avoidance provisions of § 522(f).

2. Whether the debtors' behavior with respect to the Bankruptcy Court, the Bank and its collateral exhibited bad faith and/or a failure to fulfill their fiduciary responsibilities which should have precluded them from amending their list of property claimed as exempt.

*Discussion*

*The relationship of the "spillover" exemption of § 522(d)(5) to the lien avoidance provision of § 522(f)(2)(B).*

The debtors seek to amend their list of property claimed as exempt under

§ 522(d)(5) of the Bankruptcy Code (the so-called "spillover" exemption provision) to include their interests in items of farming equipment aggregating $16,850 in value.[1] Section 522(d)(5) allows a single debtor to exempt from the reach of his creditors:

The debtor's aggregate interest in any property, not to exceed in value $400 plus up to $7,500 of any unused amount of the exemption provided under paragraph (1) of this subsection.

Paragraph (1) of § 522(d) in turn allows a debtor to exempt his aggregate interest, up to $7,500, in real or personal property that he uses as a residence. The "spillover" exemption of paragraph (5) allows a debtor with no equity in his residence to use the "homestead" exemption of paragraph (1) to exempt other property. Married debtors may combine their exemption privileges, permitting them to exempt up to $15,800 in value of property under this provision. Section 522(d)(6) allows debtors to exempt up to $750 in value of implements and tools of their trade.

The debtors seek to further avoid the Bank's liens in this property pursuant to § 522(f)(2)(B) of the Code. Section 522(f)(2) provides as follows:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this subsection [which for the purposes of this case in turn refers to the exemptions provided under subsection (d)], if such lien is—

(2) a nonpossessory, nonpurchase-money security interest in any—

(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal family or household use of the debtor or a dependent of the debtor;

(B) implements, *professional books, or tools of the trade of the debtor* or the trade of a dependent of the debtor (emphasis added); or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor.

United Bank contends that the "spillover" exemption granted by § 522(d)(5) is inapplicable to the lien avoidance provision of § 522(f)(2)(B).

The Bankruptcy Court recognized that there is a split of authority within this District on this point. (Tr. 118); *See, In re Walkington,* 42 B.R. 67 (Bkrtcy.W.D.Mich. 1984) (J. Howard) and *In re Hunter,* No. NK 80–03561 (Bkrtcy.W.D.Mich.1981) (J. Nims). In *Walkington,* Judge Howard held that the "spillover" exemptions did apply to lien avoidance under § 522(f)(2)(B). He relied on his ruling in *Walkington* in deciding the same issue in this case. In *Hunter,* Judge Nims interpreted § 522(f)(2)(B) more narrowly. Moreover, the analysis in *Hunter* relied heavily on the legislative history of § 522(f)(2) as set forth in *In re Sweeney,* 7 B.R. 814 (Bkrtcy.E.D. Wis.1980). The *Hunter* court noted that the lien avoidance provision was intended to:

apply to certain limited categories of personal property which are necessities of family life and have little if any resale value from the creditor's standpoint, but have a relatively high replacement cost so far as the debtor is concerned.

*In re Sweeney,* 7 B.R. 814 (Bkrcy.E.D.Wis. 1980) (quoted in *In re Hunter, supra,* at 5). The Bank also relies upon a more recent case, *In re Trainer,* 56 B.R. 21, 23 (Bkrtcy. S.D.Tex.1985) (explaining that there is no constitutional taking in § 522(f) because

---

**1.** The debtors seek to avoid liens in their farming machinery and equipment to this extent by utilizing a combination of their "spillover" exemptions of $7,900 each under § 522(d)(5) together with their individual $750 "tools of the trade" exemptions under § 522(d)(6). These figures aggregate to $17,300, but the debtors

have apparently chosen to exempt and retain various small tools worth $450. The Bank objects only to the extent the debtors attempt to avoid its liens in the amount of their $15,800 combined "spillover" exemptions under 522(d)(5).

the collateral has little resale value and therefore no real collateral value).

The Bank also argues that a close reading of section 522(f) reveals the congressional intent in enacting the statute which in turn provides the rationale for finding the statute constitutional.

A close inspection of subsections (2)(A), (B) and (C) of § 522(f) shows that the property described therein and subject to its terms is identical, word for word, to the property exemptions granted in § 522(d)(3), (4), (6) and (9). Having in mind the congressional purpose as set out above, we believe that the impact of § 522(f) should be limited to those particular categories of exempted property, and that as so limited, the section is constitutional.

*In re Sweeney, supra,* at 818.

The *Sweeney–Trailer* line of decisions suggest that the Code exemption for "implements" or "tools" of the trade of $750 provides evidence that Congress intended the lien avoidance provisions to apply only to property of relatively insignificant value in order to avoid "takings" problems. *See e.g., In re Trainer, supra,* at 23. Finally, the Bank asserts that the section 522(f) "deals not with the granting of exemptions, but with the avoidance of liens" and that to allow the debtor to avoid its liens in some expensive farm equipment would be to stake them to a "head start" in the amount of $15,800 as opposed to the "fresh start" contemplated by the federal bankruptcy laws. *Sweeney, supra,* at 819.

The debtors start from the plain language of the statute—as did Judge Howard in *Walkington* —in reaching the conclusion that Congress meant what was [literally] enacted and "did not intend the § 522(d)(5) exemption to be treated differently than the other exemption provisions." *In re Walkington, supra,* at 74. Section 522(f)(2)(B) clearly indicates that "... the debtor may avoid the fixing of a lien on an interest of the debtor in property *to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section,* if such lien is ... [a] tool[ ] of the

trade of a debtor or dependent of the debtor ..." (emphasis added). Moreover, the legislative history indicates that a debtor may avoid a lien "to the extent that the property could have been exempted in the absence of the lien." H.Rep. No. 95–595, 95th Cong., 1st Sess. 362 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6318 quoted in *Walkington, supra,* at 74. Moreover, "*the unused portion of section 522(d)(1) [is] applicable to any property of the estate without ... limitations.*" In re Brock, 10 B.R. 67 (Bankr.W.D.Mich. 1981) (emphasis added). Moreover, "it was intended that the non-homeowner could use the $7,500 homestead exemption for any other purpose." *Id.* at 69.

Debtors argue that at the time of the exemption election amendment they were no longer homeowners because they had lost their rights in the real estate to the bank. The Court agrees that the debtors should be able to amend their exemption request pursuant to Rule 1009. *See e.g., Tignor v. Parkinson,* 729 F.2d 977 (4th Cir.1984).

Debtors concede that there were some expensive purchase money security interest pieces of equipment, but that they are not the subject of this proceeding because the debtors previously stipulated that—as purchase money security interests—they were not avoidable. Moreover, debtors argue that the legislative history cited by the Bank—a "history" which focuses on the "overreaching creditor" with a security interest in household goods is "selective" and that the accompanying analysis is crabbed. Debtors argue that the legislative history indicates that Congress was concerned about the adhesive nature of contracts where all of the debtor's household goods were pledged as collateral. Debtors argue that farm financing is similarly "adhesive" by nature in that all of the debtor's property is required to be pledged to the Bank as collateral including all of the farm machinery new and used. *See* Brief at 5.

Perhaps even more persuasive is the *Walkington* court's critical analysis of the legislative history as set forth and "retold"

by the *Sweeney* court. Judge Howard wrote:

> The Court is not convinced that the legislative history relied upon by the *Sweeney* court compels lien avoidance in property of only nominal resale value. While the impetus in legislating § 522(f) may have been a concern about the "overreaching creditor" with a security interest in household goods [footnote omitted], Congress was also concerned with the broader policy of protecting a debtor's fresh start [footnote omitted]. The legislative history cited in *Sweeney* only makes reference to household and personal goods, yet Congress saw it appropriate to permit lien avoidance in tools of the debtors trade. Obviously, "Congress could not have been unaware that such tools might well be more expensive than ordinary household goods." *Augustine v. United States, supra,* [675 F.2d 582 at 586, 6 C.B.C. 1053] at 1057 [ (3rd Cir.1982) ]. Congress has also provided for avoidance of liens in professionally prescribed health aids for the debtor or his dependent *without any monetary limitations whatsoever.* §§ 522(f)(2)(C), 522(d)(9). (emphasis in original).

*Walkington, supra,* at 74–75.

Finally, debtors emphasize that when the Bankruptcy Code was amended in 1984 and 1986 it did not place any restriction or limitations on the amount, size, or kind of tools of the trade upon which the lien could be avoided pursuant to section 522(f)(2) even in the face of the developing case law which had often included relatively expensive farm equipment. *Cf. In re Lee,* 71 B.R. 833 (B.C.N.D., Ga.1987).

■ This Court finds the debtors' arguments, on the whole, compelling. Moreover, I also find the broader reading of § 522(f) contained in *Walkington* more persuasive than than set forth in *Sweeney.* Indeed, other circuits have followed *Walkington* and it appears to be the "majority" position. *See e.g., In Re LaFond,* 791 F.2d 623, 626–627 (8th Cir.1986) (rejecting a narrow definition of "tools of the trade" and listing courts which have also rejected a narrow definition as being "discriminatory"

insofar as it punishes farmers for being inadvertently dependent on expensive tools rather than smaller, less expensive hand tools); *see also Augustine v. United States,* 675 F.2d 582 (3rd Cir.1982).

Moreover, this Court agrees with the *Walkington* court's analysis which found the fact that the types of property that Congress specified may be subject to lien avoidance under § 522(f)(2) were in direct correspondence to the specific exemptions under § 522(d) to be insufficient evidence that Congress intended to *exclude* the "spillover" exemption from the debtor's lien avoidance power. *Walkington, supra,* at 75. The *Walkington* court emphasized that " '[i]f Congress intended that the debtor's exemption in this circumstance should be limited, ... it would have clearly expressed such intention.' *Id.* at 75 *quoting In re Eagan, supra,* at 767. *See also In re Dipalma,* 24 B.R. 385 (Bankr.D.Mass. 1982)."

■ This Court also finds the unconstitutional takings argument unpersuasive. It is clear that "avoidance of a lien does not destroy the underlying debt but rather changes the status of a creditor from a secured to an unsecured position." *Id., See also U.S. v. Security Industrial Bank,* 459 U.S. 70 (1982) (questioning whether in enacting § 522(f) Congress could be said to have implicated the takings clause or merely provided for a rearrangement of private contractual rights).

Finally, even assuming that a broad interpretation of the "spillover" and "tools of the trade" sections would somehow hinder the financing of certain professions, these considerations are more properly confined to and addressed in the legislative arena. Put simply, the Court finds the Bankruptcy Court's reliance on and application of *Walkington* to be appropriate and correct as a matter of law. Accordingly, the Court finds the Bankruptcy Court's decision that the "spillover" exemption of § 522(d)(5) is applicable to the lien avoidance provision of § 522(f)(2)(B) to be correct as a matter of law.

It remains for the Court to address the second question presented here: whether

the debtors' behavior with respect to the Bank's collateral exhibited bad faith and a corresponding willful failure to fulfill their fiduciary responsibilities so that they should be precluded from utilizing their exemptions. The Bank has phrased the second issue more broadly. The Bank in effect argues that the alleged negligent supervision of assets in itself amounts to "exceptional circumstances" that should lead this Court to deny the debtors' permission to amend their schedule and use their "spillover" exemption.

Bankruptcy courts may deny debtors the privilege of amending their list of exempt assets where the debtor has acted in bad faith, *Lucius v. McLemore*, 741 F.2d 125, 127 (6th Cir.1984); where a party in interest may be prejudiced, *In re Drake*, 39 B.R. 75 (Bkrtcy.E.D.N.Y.1984); and where exceptional circumstances so warrant, *Tignor v. Parkinson*, 729 F.2d 977 (4th Cir. 1984).

United Bank concedes that allowance of the amendments requested by the debtors would not technically prejudice it. The Bank argues that it was a secured creditor, yet during the pendency of the debtors' Chapter 11 proceeding the debtors dissipated the Bank's collateral and for the most part failed to make adequate protection payments ordered by the Bankruptcy Court to compensate the Bank for this collateral deterioration. The Bank argues further that the debtors have been unable to adequately explain what happened to much of the collateral.

The Bank argues further that the debtors' bad faith dealings with the Bank and their negligent supervision of assets of the bankruptcy estate amount to such "exceptional circumstances" that to now permit the debtors to receive further sums violates the notions of fair play, equity and justice.

Section 1107(a) of the Bankruptcy Code provides that a debtor in possession is subject to the same duties as a trustee in bankruptcy, excluding certain investigative duties not relevant here. 11 U.S.C. § 1107(a). Further, "debtors in possession

must live by the same standards as trustees." *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 217 (Bkrtcy.W.D.Mich.1986) (citing *Robbins v. Schuyler*, 47 B.R. 818 (Bkrtcy.W.D.Mich.1985). Specifically,

> a debtor in possession has the duty to protect and conserve the property in his possession for the benefit of creditors. *Matter of Halux*, 665 F.2d 213, 216 (8th Cir.1981). *See United States ex rel. Willoughby, Trustee v. Howard*, 302 U.S. 445, 450 [58 S.Ct. 309, 312, 82 L.Ed. 352] (1938); *In re Custom Made Tires Corp.*, 108 F.2d 172 (2d Cir.1939); *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693, 694 (6th Cir.1932).

*Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir.1982).

When a debtor in possession fails to exercise due diligence to conserve assets of the bankruptcy estate, he must account for the assets dissipated through his negligence. *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693 (6th Cir.1932) *cited in In re Reich*, 54 B.R. 995, 998 (Bkrtcy.E.D. Mich.1985). A debtor in possession is obliged to exercise the level of care, diligence and skill of an ordinarily prudent person in the conduct of his private affairs under similar circumstances and with a similar object in view. *Reich, supra,* at 998. A failure to meet this standard of care subjects a debtor in possession to liability for losses suffered by the estate. *Id.* The Sixth Circuit has held that a bankruptcy trustee (or a debtor in possession) is liable in his personal capacity *only for acts willfully and deliberately in violation of his fudicuary duties. Ford Motor Credit,* 680 F.2d at 461. A debtor in possession will be liable in his official capacity, however, the for negligent violation of his fiduciary duties. *Id.*

The Bank argues that the debtors, at the very minimum, failed to exercise due care with respect to the protection and conservation of the assets of their bankruptcy estate, and should therefore be held accountable pursuant to § 704(2) of the Bankruptcy Code.[2] Simply put, the Bank argues

---

**2.** This section provides that among a trustee's (or debtor in possession's) duties is the duty to

account for all property received.

that the debtors have not fulfilled their fiduciary duties as debtors in possession. For example, the Bank argues that some $3,000 worth of farm equipment including a four row corn planter and a table saw disappeared during the pendency of the debtors' Chapter 11 proceedings. (Tr. 53–55). The Bank further argues that the debtors did not insure this equipment, did not file police reports when it turned up missing and failed, in general, to safeguard against its loss. (Tr. 54). In addition, while the debtors apparently kept some records of livestock and equipment (Tr. 56), they are presently unable to find those records and may have disposed of them (Tr. 56–57).

The Bank makes much ado about discrepancies in the testimony by the debtors and their son concerning the number and kinds of cattle owned and/or leased by the debtors on the petition date and the conflicting accounts as to the reasons for the discrepancy. As the Bank sees it, the fundamental question before the Bankruptcy Court was: What happened to the "missing" cattle? Or put differently, how many cattle which were subject to the Bank's lien did the debtors *really* own on the petition date? The Bank has provided this Court with a mathematical table demonstrating the [apparently] dramatic discrepancy in the "cattle count." The Bank suggests that more is at play here than failed memory or innocent revision. The Bank suggests that certain cattle disappeared in almost "Orwellian fashion." On each retelling the [same] cows which had previously existed suddenly disappeared. They became, in a word, "uncattle." Bank's Brief at 16.

The Court thinks a different metaphor or perhaps, more accurately, a different allegory may also explain their ontological demise. The Court is reminded of a pastime no doubt engaged in by many youthful passengers who once had to endure long trips in the family car and perhaps now, in the family camper. To make the journey seem less tedious, each passenger, or group of passengers, counts the number of "cattle" that can be seen from the windows on the side of the car on which he or she is sitting. The number of cows must be counted out loud and a running tally is kept. When a cemetery is passed, the player on whose side the cemetery is located must "bury" his or her cows—but only if the opposing player calls the presence of the cemetery to the opponent's attention. Needless to say, when a car passes large herds which may be scattered about at a great distance, or when the cows are huddled in a mass of head and hooves near the barn, or when there are herds of cows on both sides of the highway, disputes often break out as to the accuracy of the other's count. The Court does not intend to make light of the Bank's argument concerning its depleted collateral. The Court is well aware that the word "chattel," a thing of personal or movable property, is derived from the word "cattle" which itself was an early form of movable, personal property. *See* generally D. Mellinkoff, *The Language of Law* (1963).

The Bank notes that because of the confusing nature of the hearing testimony concerning the number of cows owned at various times, Judge Howard merely found the debtors' testimony to be "self-serving" but concluded that he could find no intent on the part of the debtors to secretly dispose of estate property and to retain the proceeds for themselves (Tr. 122–123). The Bank argues strenuously that the magnitude of the discrepancy was not immediately apparent to the Bankruptcy Court precisely *because* of the confusing nature of the debtors' testimony. Moreover, the Bank argues that when the behavior of the debtors is seen in its totality, more than mere negligence is evidenced. The Bank emphasizes that accurate records could clarify the disappearance of the cattle but that they were apparently lost or misplaced. The Bank argues that standing alone such "misstatements," conflicting explanations of the disappearance of collateral, and failure to secure equipment all may be negligent, but taken together the behavior should be seen as more than negli-

gent, approaching, in fact, bad faith. The Bank asserts that in June of 1984, the debtors claimed to have owned at least ninety-eight cattle on the petition date of October 23, 1983. Twenty months later, they claimed to have owned only fifty-four cattle on the petition date. The Bank argues that the value of the missing collateral far exceeds the amount of the lien avoidance the debtors presently seek and that the debtors, not the Bank, should bear the burden of the failure to exercise due fiduciary care in looking after the property of the estate. *See* generally Bank's Brief at 15–20. The Bank concludes that the Bankruptcy Court's finding of no bad faith was a clearly erroneous finding of fact.

In the alternative, the Bank argues that even if the debtors contend that their earlier statements concerning the ownership of more than fifty-four cattle on the petition date arose from a misunderstanding and were meant to include leased cattle, it was the debtors who created the misunderstanding and the Bank justifiably relied on their representations to its detriment. (*See* 1984 Tr. 52; Tr. 77). The Bank further concludes that even if the "disappearance" of the Bank's collateral including some forty-four cattle and almost $3,000 worth of equipment is not seen as "bad faith," the totality of the facts in this case demonstrates "exceptional circumstances" which would warrant the denial of the exemption amendments. Finally, the Bank emphasizes that it does not wish to hold the debtors liable in their personal capacity but rather merely in their official capacity. Phrased differently, the Bank would not hold the debtors personally liable for the value of the estate property for which they cannot account but only seeks to avoid paying over $16,850 cash to the debtors who, according to the Bank, have already received greater sums as a result of their own negligent behavior. *See* Bank's Brief at 20.

Debtors argue that there is no evidence that they filed any false reports or used the debtor in possession account for personal expenses. Debtors further assert that Judge Howard found that the sale of the milk cows was accomplished in a commer-

cially reasonable manner. (Tr. 121). Debtors further argue that the Bank was aware of the problems debtors had in replacing insurance and could have "forced placed" insurance earlier. Debtors' Brief at 13–14. Debtors also indicate that they had been evicted by the Bank and had moved twice before the hearing and could not find all their records at that time. (Tr. 58–59).

As to the claims of missing cattle and equipment, the Court notes that Judge Howard was quite familiar with this case and heard testimony on June 5, 1984 to January 5, 1987. Judge Howard had ample opportunity to observe the demeanor and assess the credibility of the witnesses. Judge Howard concluded:

> I haven't found anything in the Debtor's overall performance that would indicate any intention to defraud, to sell these cows and to use the proceeds for himself. It is one thing to find a confusing state of facts, which clearly is present here, and another to find that the Debtor committed some type of fraud, sold the cows, hid the cows, disposed of the cows, and did this to the detriment of the security holder the bank ... I find no evidence of [fraud] at all. There is a suspicion on the disappearance of the corn planter and the fertilizing machine, but no evidence that the Debtor converted the property, hid it, or disposed of it, and that is basically what I have to find for a determination that he acted in bad faith in this case. So I hold that there is no bad faith on the part of the debtor during these bankruptcy proceedings.

Tr. at 123.

It is well settled that "[u]nder the clearly erroneous standard, as long as the judge's inferences are reasonable and supported by the evidence, they will not be overturned." *In re Southern Ind. Banking Corp.,* 809 F.2d 329, 331 (6th Cir.1987) (citing *Osborne v. Product Credit Ass'n. of River Falls, Wis.,* 42 B.R. 988, 995 (Bankr.W.D.Wis. 1984)). This Court holds that the bankruptcy judge's finding that the circumstances surrounding the disappearance of the cattle and equipment did not demonstrate bad faith on the part of the debtors was not

clearly erroneous. While the Court agrees with the Bank that certain aspects of debtors' behavior may have been negligent or perhaps more than negligent in some respects, the Court does not believe that even had the [apparent] troublesome discrepancy in the testimony concerning the actual number of cattle been more clearly articulated to the Bankruptcy Court that those additional revelations would have warranted a finding of bad faith on the part of the debtors. As Judge Howard indicated, in cases of this type where part of the Bank's collateral is cows—which can be "concealed" and/or be made to "disappear,"—"... the Bank is at a real disadvantage, because often fraudulent acts are done in secret." (Tr. 123). Still, Judge Howard indicated that even "if we had a debtor that intended to defraud the Bank, there was ample opportunity in this case to do so, and I found no evidence of that at all." (Tr. 128).

 Further, even upon reviewing those facts as well as the additional arguments presented here *de novo*, the Court cannot say that those circumstances are so exceptional as to warrant the denial of the exemption amendments. In making its determination, the Court is guided by "the clear mandate of the rule[:] ... to allow amendment freely." *Tignor v. Parkinson*, 729 F.2d 977 (4th Cir.1984). Moreover, as the Bank notes, exemption statutes are to be construed liberally in favor of the debtor. It is true that it has been said that bad faith or prejudice to the creditors *might* bar amendment. *See In re Doan*, 672 F.2d 831, 833 (11th Cir.1982). But as the Bank concedes, even a finding of bad faith would not *mandate* the denial of the requested amendments. Still, the Court does not believe that the situation here indicates such extreme circumstances as to bar the debtors from amending their schedules. Nor is the Court persuaded by the Bank's argument that the Court should bar amendment even assuming, *arguendo*, the debtors have violated their fiduciary duties in their "official capacity." Equally unpersuasive is the Bank's alternative argument that it justifiably relied on the misunderstanding concerning the debtors' representations concerning the number of cattle they owned. Moreover, in this regard the Bank failed to file timely a complaint pursuant to Section 523 of Section 727, thereby waiving any rights it may have had with respect to an action that would seek a determination that the debt is non-dischargeable or that the discharge should be denied. (*Cf.* Tr. 119).

Accordingly, for all the reasons previously set forth in this opinion, the Court finds that the Bankruptcy Court's findings of fact are sufficiently supported by the evidence contained in the record and are not clearly erroneous. Further, to the extent that the Court's review can be said to have involved a mixed question of law and fact the Court has undertaken a *de novo* review. Again, the Court concludes that debtors should be permitted to amend their schedules. The Court will enter an order indicating that the Bankruptcy Court's opinion of March 23, 1987 concerning the debtors' motions for lien avoidance and amendment of exemptions is affirmed in full.