**In re Eugene ALPERN, Debtor.**

**Bankruptcy No. 93–B–7643.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 29, 2000.

Eugene Walter Alpern, pro se.

Dean Harvelis, Assistant U.S. Trustee, for Respondent or Defendant.

Lawrence Fisher, Chapter 7 Trustee.

### MEMORANDUM OPINION ON DEBTOR'S MOTIONS AND FILINGS

JACK B. SCHMETTERER, Bankruptcy Judge.

The Debtor Eugene Alpern ("Debtor" and "Alpern") has moved for removal of and other relief against the Chapter 7 Bankruptcy Trustee Lawrence Fisher ("Fisher" or "Trustee") based on various accusations against him and the former bankruptcy judge on this case, the Honorable Thomas James. Pursuant to this Opinion by separate orders the Debtor's motions are denied and his wild unfounded accusations are stricken.

Based on the docket of this case, published rulings by other courts against Alpern, and evidentiary hearing held on Alpern's motions, this Opinion will stand as Findings of Fact and Conclusions of Law.

### Background as Shown by Docket and Reported Decisions

Before describing the pleadings now in issue, it is appropriate to recount the case history shown by the docket of this case and reported opinions relating to Alpern.

This bankruptcy case started with filing of a voluntary Chapter 7 Petition by Debtor on April 8, 1993. After the designation of Lawrence Fisher as Successor Chapter 7 Trustee on May 27, 1993, Debtor moved to covert the case to one under Chapter 11, and that motion was granted on October 12, 1993. Two days later, three creditors including Debtor's former wife Phyllis Alpern together with creditors Allen Gabe and Robert Blain moved to reconvert the case to one under Chapter 7.

Although Debtor does not recognize it, Phyllis Alpern was then indeed his former spouse. Debtor persists in his pleadings in refusal to recognize the divorce decree entered by judgment entered in the Circuit Court of Cook County on August 10, 1992, but that judgment was affirmed by order of the Appellate Court of Illinois, First District, on August 24, 1995. *In re Marriage of Alpern*, 274 Ill.App.3d 1097, 691 N.E.2d 1194 (Table) 229 Ill.Dec. 471 (1995). That affirmance followed Debtor's repeated efforts through suits filed in our District Court to enjoin the state court divorce proceeding and then to attack collaterally the state court judgment. Those suits failed because federal courts lack jurisdiction over divorce proceedings, and also because the Rooker–Feldman Doctrine excludes any possibility of relief in federal court from the state court judgment. *See Eugene W. Alpern v. Lieb, et al.*, 38 F.3d 933 (7th Cir.1994), and cases cited (a decision which Alpern misreads to grant him victory over claimants in the bankruptcy proceeding).

Nonetheless, refusing to take no for an answer Debtor persists here in attacking validity of the state court order of marriage dissolution. On the same reasoning as that set forth in the cited Seventh Circuit opinion involving Alpern, this court lacks any authority to question the state court judgment and must treat as frivolous Mr. Alpern's continuing effort to reconstruct his dissolved marriage through federal court proceedings.

After some skirmishing between Debtor and his former wife and others in this bankruptcy case, former Bankruptcy Judge Thomas James who was earlier assigned to this case granted their motion to reconvert it to one under Chapter 7 of the Bankruptcy Code by order entered De-

cember 20, 1993. This followed his denial of Debtor's first Motion to Disqualify Judge which Alpern presented that day.

Debtor filed objections to the claims of Phyllis Alpern, Robert Blain, and Allen Gabe, and hearings on those objections were continued from time to time. In the meantime, Debtor moved Judge James to reconsider and vacate his two orders entered December 20, 1993 (one reconverting to Chapter 7, and one denying the motion to disqualify the Judge). He filed a second motion to disqualify Judge James on March 10, 1994.

On April 28, 1994, Judge James issued several rulings, (1) denying Alpern's motion to reconsider and vacate the two orders entered December 20, 1993; (2) denying Debtor's motion to strike some creditor pleadings; and (3) denying Alpern's second motion to disqualify the Judge. The orders of April 28, 1994, were appealed by Alpern's Notice of Appeal filed May 6, 1994. His motion to stay the bankruptcy proceedings pending appeal was denied by Judge James on May 25, 1994.

On June 1, 1994, Judge James entered orders overruling Alpern's pending objections to claims, thereby allowing the following claims:

— Phyllis Alpern's claim filed August 19, 1995 allowed in full for $76,000 plus interest;

— Phyllis Alpern's claim filed October 21, 1993 allowed in full for $5,000 plus interest;

— Allen Gabe's claim filed August 19, 1993, allowed in the amount of $10,499.40 plus interest; and

— Robert Blain's claim for $6,100 reduced and allowed in amount of $3,350 plus interest.

Debtor moved on July 6, 1994, to vacate all the orders entered June 1, 1994, which motion was denied.

In the meantime, Alpern's appeal to the District Court did not fare well. He was ordered in June to file his appeal brief by July 8, 1994, and when he did not do so the appeal was dismissed by District Judge Marovich for want of prosecution on July 25, 1994.

After the bankruptcy case had been reconverted to one under Chapter 7, Trustee Fisher proceeded with steps to sell Debtor's home. He obtained on September 26, 1994 an order allowing his retention of a broker and requiring Debtor to allow site access to the broker and Trustee. Debtor filed notice of appeal from that order on October 5, 1994.

Alpern did not allow access to the premises to be sold, so Trustee Fisher sought on November 16, 1994 to have him held in contempt. Hearing on that motion was continued several times, but further continuance requested by Debtor was denied by Judge James on December 12, 1994.

On December 16, 1994, Alpern sought removal of the bankruptcy case to a District Judge.

In 1995, Debtor's appeals to higher courts and his recalcitrance in the face of Judge James order for cooperation in selling his home all collapsed. His appeal of the several orders of Judge James entered April 28, 1994, was dismissed by District Judge Marovich on July 7, 1995. Judge James ordered on November 27, 1995, that Alpern appear in response to the pending motion to hold him in civil contempt, and on December 11, 1995, he was found in civil contempt and ordered to pay $250 per day until he complied with the orders to deliver keys to his house to the Trustee. The order also threatened to have him arrested if he failed to comply by January 12, 1996. On December 26, 1995, he moved to vacate the December 11, 1995 order, a motion later denied.

On February 7, 1996, the Trustee was authorized to borrow $7,500 from Phillis Alpern and grant her a lien on Debtor's home that the Trustee sought to sell, thereby providing initial cash for the estate. Debtor presented that day his third

motion to disqualify Judge James, and when that motion was denied, filed an appeal from the lien order and the order that day denying disqualification of the Judge.

As the year 1996 opened, Debtor had still failed to comply with Judge James order of September 26, 1994 for turnover of a key to the premises to facilitate sale of his home, nor had the threatened imposition of fines and jail ordered on December 11, 1995, brought about compliance. Therefore, Judge James ordered on March 13, 1996, that the U.S. Marshal go out to the premises and remove the Debtor therefrom, and then put Trustee Fisher in sole possession. Debtor's oral request that day for a stay of that order was denied. On March 25, 1996, he filed a motion before Judge James to vacate the order for the U.S. Marshal action, a motion denied the next day for Alpern's failure to serve notice of the hearing. Alpern moved on April 3, 1996 to vacate the March 26, 1996 order and the same day filed still another motion (his fourth) to disqualify Judge James. The same day, Judge James authorized Trustee Fisher to employ someone to take inventory of the contents of Debtor's home.

Debtor moved to enjoin Trustee's effort to sell the premises, but that motion was denied June 15, 1996.

By reason of his disobedient conduct and civil contempt in violation of the two-year old order to allow the broker and Trustee access, Judge James entered judgment for Trustee and against Alpern on the civil contempt fine, a judgment for $8,000. The same day the Trustee was authorized to sell the premises.

Still seeking to block the sale of his home, Debtor recorded two purported *lis pendens* notices concerning his residence with the Cook County Recorder of Deeds, thereby clouding the title. On motion by the Trustee, Judge James ruled on June 12, 1996 that those filings were in violation of the automatic stay under 11 U.S.C. § 362, a provision that protects property of the estate in possession of a Chapter 7 trustee. The two *lis pendens* filings were therefore found to be null and void.

In the meantime, one more of Alpern's appeals to the District Court bit the dust, being dismissed on May 31, 1996 for want of prosecution and failure of Alpern to file an appeal brief.

Sale of Alpern's home was closed, after Fisher had the contents inventoried. The Trustee was allowed to employ a storage company to remove and protect Alpern's goods found in the house because Debtor had failed to remove them by the date when possession was delivered to the new property owner.

One of Alpern's many appeals came before District Judge Ann Williams on May 31, 1996 who filed an unpublished Memorandum Opinion and Order (appended as **Appendix A** hereto) which recited an even more complete history up to that date, incorporated here through the attachment. An excerpt from her Opinion gives the flavor of that history:

> A review of appellant's own briefs and supporting documents demonstrates that Alpern has engaged in a consistent pattern of dilatory conduct and outright disregard of court orders. Alpern's disrespect for these proceedings began on December 20, 1993, when Judge James converted the bankruptcy from a chapter 11 to a chapter 7 proceeding. Thereafter, Alpern filed at least four motions to disqualify Judge James.... From the docket, it appears that Alpern spent so much time trying to disqualify Judge Alpern [sic] that he neglected his own case.... When Alpern failed in his efforts to disqualify Judge James or to have the judge's rulings reversed, Alpern became completely uncooperative, refusing to allow his property to be inspected or to turn over the key to the premises.... These actions demonstrate Alpern's indifference to the judicial proceedings and general bad faith.

In exercising discretion to dismiss this appeal, the court is mindful that the need to enforce procedural rules must be balanced against the need to provide a litigant with an adequate opportunity to present a claim. However, Alpern had an opportunity to present his appeal—he simply did not take it. . . . During the time that he could have been preparing his brief, he instead filed an emergency motion to vacate bankruptcy court order and petitioned for mandamus.

Prior to Judge Williams' dismissal of Alpern's appeal of the Marshal Order, Alpern filed in the Seventh Circuit Court of appeal, *inter alia*, an expedited motion for immediate stay of the Order for the U.S. Marshal to remove him, a motion for change of venue to another circuit (based on asserted bias of all of the Seventh Circuit judges), and a petition for a writ of mandamus against Judge James essentially seeking review of orders described above. Trustee Fisher supplied attorney services to defend the rulings of Judge James and opposed the requested mandamus. All of Alpern's motions, and his petition for writ of mandamus were summarily denied by the Seventh Circuit by order dated April 19, 1996, a copy of which is attached as **Appendix B** hereto.

On September 20, 1996, Trustee Fisher moved for allowance of attorney's fees. Those fees were objected to by Alpern, one objection being that fees were sought by Fisher for defending the mandamus petition filed by Debtor against Judge James. Alpern then presented on October 8, 1996 his fifth motion for disqualification of Judge James for that judge allegedly accepting unearned compensation from an interested party (i.e. accepting legal services from Fisher), a motion and issue to be discussed more fully below.

By Memorandum Opinion and Order of December 20, 1996, Judge James ordered the Trustee to pay 100% of administrative expenses other than his fees, and then to pay the balance of funds on hand to himself and his counsel. The objections of Alpern were overruled.

Judge James later left the bench, and the bankruptcy case was since reassigned ultimately to the undersigned in January of 1998.

### Alpern's Current Filings

Alpern has now filed a flurry of papers:

— On October 27, 1999, he accused Trustee Fisher of stealing estate property;

— On November 10, 1999, he moved that Trustee Fisher be removed;

— On November 10, 1999, he moved that Fisher be ordered to give a detailed account of estate property, and also filed a copy of a letter he wrote dated March 4, 1996 that was addressed to the Deputy U.S. Attorney;

— On November 10, 1999, he filed yet another letter, this one addressed to the Court; and

— He accused Judge James of taking a bribe from Fisher and participating in conversion of Alpern's property.

The undersigned on November 17, 1999, struck one of the letters as having been presented without motion or notice of motion. Alpern continues to send in unfiled letters making various arguments and accusations without sending copies to Trustee Fisher or presenting them in court on motion to seek specific relief.

### Pending Issues

Debtor's pending lengthy filings boil down to three accusations:

1. That Trustee Fisher wrongfully took a silver service from his former home when Debtor's goods were removed after the home sale closed. Alpern calls that a theft, but as discussed below it turns out that Fisher removed the service to protect it from possible loss, and later (long

before Alpern filed the pending motion) had it delivered it to Alpern.

2. That Judge James accepted the services of Fisher through representation of the Judge against Alpern's effort to obtain mandamus against the Judge, without paying Fisher out of his pocket because he authorized payment from the estate. Alpern calls that acceptance of a bribe. He also argues that when Fisher was paid out of estate assets for defending the mandamus filed against Judge James, that was payment of a bribe.

3. That Trustee and Judge James are responsible to account to Alpern for personal exempt property removed from his home and stored, accusing the Judge and Fisher of converting that property.

As discussed below, defense by a bankruptcy trustee of a judge's ruling in trustee's favor, and compensation of the trustee and his counsel from the estate for defending the judge's rulings, are quite proper acts not in any way resembling the giving and taking of a bribe.

When Alpern was trying to obstruct Trustee's sale of his home, apart from recording spurious *lis pendens* notices and filing of appeals that were not perfected, one more problem he caused was by neglect to remove his goods from the home at the time the buyer was entitled to possession. With approval of Judge James, Fisher employed Supreme Storage and Moving Company ("Supreme") to remove and store Alpern's goods found there, and was allowed to pay storage fees for a limited time. Fisher also found a valuable silver service and took the wise precaution of taking personal custody of that silver service until he caused it to be returned it to Alpern.

All of the foregoing efforts to protect Alpern's personal property which he asserted to be exempt has been construed by him as a great offense. The wise move of Fisher to keep the specially valuable silver

service away from the storage company Alpern calls a theft. And Alpern's failure to pick up his goods from storage after he paid storage fees for many months has now lead to his argument that he does not know what Supreme may be storing, and therefore his argument that the Trustee must account for what Supreme stored. Speculating that Supreme did not keep all of his property, he accuses Fisher of converting to his own use everything Supreme did not put in storage. In short, Alpern refused to pick up his goods out of storage and look inside the stored boxes, and now contends that the Trustee must account for his exempt property not in the estate that Alpern refused to accept and take responsibility for. He further argues that unless Fisher accounts for that non-estate property, "there is no way to establish that Judge James did not participate in conversion of any of Eugene's personal property to Judge James". Having closed his eyes to what was stored in his interest, Alpern accused the Trustee and Judge of having stolen from him. Because Alpern has not look into the stored crates, he asks this Court to assume or speculate along with him that Fisher and Judge James may have converted all his property.

Alpern identified only one specific piece of property said to be converted by Fisher, the silver service referred to earlier. At the evidentiary hearing held January 5, 2000, Alpern admitted that he bases this accusation only on the fact that Fisher took the service away when the storage company was removing Debtor's other goods, even though Fisher subsequently delivered it to Alpern long before he filed his motion to remove Fisher. True to his belief that any deed done to protect his property was necessarily a crime, Alpern says those acts amounted to theft or conversion of his property.

### Petition for Accounting

█ Although Trustee does not owe a final accounting for estate property until

his final report, he appended to his filing here copies of the closing statement from the house sale (**Appendix C**) and his report of estate property on the U.S. Trustee's Form 1 (**Appendix D**).

As for goods in Alpern's house, the Trustee's filing on December 17, 1999, gave the following accounting of Alpern's goods which Alpern has not since attacked or questioned:

The locks were changed and keys given to the Trustee and to the real estate broker. The inventory taker made an inventory of the furniture and certain household goods, limited by the chaotic condition of the premises. The floors were strewn with papers, magazines, and books, piled several feet high in places, without any apparent order or organization, throughout every room of the home, including the bathrooms and basement area. Both the inventory taker and the Trustee made a photographic inventory of the contents of the home, room by room and area by area. Alpern was invited to remove from the home whatever personal property he wished, and he did remove certain personal effects and his personal computer and accessories. The only item removed from the home by the Trustee was a group of identical sterling silver place settings. Because of their relative size and value, the Trustee determined that these items would be more secure in his possession rather than being left in the home, inasmuch as the premises would be accessible to others in connection with the preparation of the residence for sale and showing to prospective buyers. These items were subsequently delivered to Alpern at the offices of Gardner Carton & Douglas. At one time, Alpern also accused the Trustee of removing and possessing certain porcelain plates. Upon inquiry, the Trustee was advised by Mrs. Alpern that these plates were her property and were taken by her at the time of the divorce.

The Trustee, in connection with the preparation of the home for showing and sale, secured an order from the court authorizing removal of the contents from the home to a storage facility to be held in the name of Alpern and for his account. The Trustee was also authorize to pay the entire moving expenses and the storage charges for a short period of time. Thereafter, the storage costs would be the responsibility of Alpern. Prior to the move and storage, Alpern was provided another opportunity to remove anything he wished to take before the contents were stored at the storage company. Alpern again removed certain personal effects from the home.

The physical moving of the contents of the home occupied several men and two trucks for several days. Several hundred boxes were required for the move. Alpern had insisted that the papers were valuable; accordingly, the Trustee incurred the expense of boxing, moving, and storing the voluminous paper in the home.

Alpern was advised of the name and location of the storage facility and of the fact that the storage was for his account and that he could remove, without the Trustee's permission, knowledge, or consent, any or all of the items in storage. The only items that remained on the premises were the household appliances, some obsolete computer equipment that had apparently been assembled in the basement and which could not be removed without being disassembled, and certain bottles and containers of unknown chemicals. Alpern, although a professional chemist, refused to cooperate with the Trustee in identifying the chemicals stored in the home. It was therefore necessary for the Trustee to retain an environmental disposal company to identify, remove, and dispose of the chemicals. The total costs of the move amounted to $3,000 and the costs of the environmental dispos-

al services were $1,600. These amounts were paid for by the Trustee from estate funds.

The Trustee has been advised by the storage company that Alpern paid monthly storage charges for the first twelve months and made partial payments for another year. Thereafter, he ceased making payments altogether. Further, the Trustee was advised by the storage company that they recently gave Alpern notice that unless he removed his personal property from their facility, they would dispose of the property in accordance with their legal right to do so. The Trustee has no knowledge as to whether Alpern has taken physical possession of the property.

Alpern has persisted in his charges of theft by the Trustee and several years ago made these charges to the Morton Grove Police Department and to the U.S. Attorney's office. No action was taken, and the Trustee categorically denies that he has taken or holds any personal property belonging to Alpern.

Fisher has thereby accounted for all estate property in the manner required by the U.S. Trustee, and also accounted for all exempt non-estate property which he safeguarded for Alpern's benefit.

Contrary to Alpern's assertions, the Trustee has provided the accounting required by law and more. He has rendered, in accordance with requirements of the United States Trustee's Office, accounts of the financial administration of this estate showing all receipts and disbursements. All moneys of the estate, derived solely from the sale of the Property, have been expended in connection with closing of the sale transaction, including commission of the broker, prorations, closing costs, payment of judicial liens on the Property, expenses of a locksmith, storage and moving expenses, expenses of removal and disposal of chemicals found in Alpern's home, expenses of the inventory taker, costs for services rendered by the United States Marshal, payment of tax liability arising from the sale of the home, both state and federal, and Trustee's commissions and legal fees relating to the administration of the estate. All moneys have been expended and distributed, and the current balance of the estate account is zero.

■ The silver service was not converted, but was safeguarded and returned to Alpern. With respect to Alpern's personal property removed to the storage company, that property was claimed as exempt by Alpern and consequently was not property of the estate but remained Alpern's responsibility. The Trustee did, nonetheless, as a precautionary measure, have an inventory taker describe the personal property in the home, and also made a photographic inventory of the contents of the home, room by room and area by area. Alpern complains that the storage company cannot provide him assurance that the personal property now stored there belongs to him; yet Alpern paid the storage charges on that property, in whole or in part, for almost two years without examining the contents or taking possession of it.

Finally, Alpern asserts in the Petition for Accounting that since the Trustee obtained no court authority to remove the sterling silver set from the home, he must have been converting the property. Alpern then accuses the Trustee of having bribed Judge James and suggests that Judge James may therefore have participated in the conversion.

■ In response to these absurd charges, the Trustee first notes that the silver, which was removed for safekeeping purposes, was long ago returned to the Debtor. The Trustee had no obligation to obtain a court order prior to taking possession of a potential estate asset later determined to be exempt. Accordingly, the premise for Alpern's conversion theory is wholly meritless both in fact and in law. Alpern's suggestion that Judge James may

have participated in this fanciful "conversion" because of a bribe by the Trustee is not only absurd but unconscionable. Apparently, the "bribe" referred to by Alpern is the performance of legal services by the Trustee in defense of the petition for writ of mandamus, the motion for stay, and other motions filed in the Seventh Circuit, as described above. Alpern believes that the Trustee, in defending the estate's interests in those proceedings, was actually defending Judge James. In his pleading, Alpern does not recognize that it was the Trustee's duty and obligation to protect the estate's interest against the delay in administration that would be caused by any allowance of the petition for mandamus or the motions for disqualification or for the various stays of orders that Alpern sought. The Trustee's responses, which were rendered as part of the administration of this estate and occasioned only by the legal maneuvering of Alpern in his three year attempt to hinder, delay, and thwart the Trustee in his work, were required to bring the estate administration to closure. The court-authorized payment for legal services, pursuant to the Trustee's fee application duly noticed to creditors and Debtor, was not in any way for services rendered personally on behalf of Judge James and cannot be considered, by any stretch of a reasonable and rational imagination, a bribe. Accordingly, the suggestion that Judge James participated in the "conversion" of property because of the asserted "bribe" falsely and frivolously impugns the integrity of both Judge James and Mr. Fisher. Moreover, the fee allowance ordered by Judge James that Alpern now calls a bribe was never reversed by a higher court.

### The Petition for Removal of Trustee

■ In the Petition for Removal, Alpern again asserts that the Trustee paid a bribe to Judge James, that he removed estate property to his home and converted it, and that Alpern was never provided an inventory of personal property removed to the storage company. Alpern further asserts

that because Judge James denied him his right to a Chapter 11 proceeding, the case is actually still in Chapter 11 and that the order appointing the Trustee is therefore void. Finally, he claims that removal of Fisher is required because of "criminal activity" on the part of the Trustee, viz., the alleged conversion.

The first three allegations set forth above have already been addressed and disposed of hereinabove. With respect to allegations that the order appointing the Trustee is void because the case is actually still in Chapter 11, this issue was long ago adjudicated to finality. The conversion order reconverting this case to Chapter 7 was a final, valid, and binding order, the case is a case under Chapter 7, and Alpern's allegation previously made and rejected on prior occasions that this order was void for lack of due process and deprivation of constitutional rights is not only barred by *res judicata* but is baseless and frivolous. Alpern even continues to complain about Judge James allowing several claims against the estate. However, appeals in which Alpern has raised this issue, both to the District Court and to the Seventh Circuit Court of Appeals, have been resolved against him. Finally, Alpern's assertion that removal of Fisher is required because of criminal activity on the part of the Trustee is groundless, inasmuch as he bases it upon an asserted property conversion which, as discussed above, never occurred

The Trustee's pleading sets forth more details about the foregoing history. It appears that a number of district court proceedings not shown on our docket were held as Mr. Alpern asserted his many contentions that no orders by the state court or Judge James or higher courts were valid. However, the pending motions may be decided based on the foregoing record and Alpern's allegations and testimony at the hearing, so no hearing to determine more details is necessary.

### Discussion of Authority

#### 1. Care of Alpern's Property

■ Whenever any bankruptcy trustee takes actual custody of a debtor's property, whether exempt or nonexempt, a duty arises under statutory responsibilities or under common law theories of bailment or agency. *In re Reich,* 54 B.R. 995, 1003 (Bankr.E.D.Mich.1985). Upon taking possession, the trustee owes a duty to the debtor to exercise ordinary care to protect the property. *Id.* However, by storing exempt household property in this case for a time following the house sale and through payment by the estate of the storage costs for a time, Fisher certainly exercised a high degree of care (far beyond "ordinary") as to that property. And by specially protecting the valuable silver service against possibility of damage or theft before returning it to Alpern, Fisher also exercised at least ordinary care.

#### 2. Fees Paid to Resist Mandamus and Defend Court Orders

■ Trustees are representatives of the bankruptcy estate, charged with doing whatever is necessary to advance its interests. Collier on Bankruptcy, ¶ 704.03 (1999). A trustee may hire an attorney to assist the trustee in carrying out duties in a liquidation proceeding, or the trustee may act as his own attorney. 11 U.S.C. §§ 327(a)-(d).

■ In order for professional services to be compensable those services must have been rendered for the estate's benefit. 11 U.S.C. § 330(a). In the "benefit to the estate" analysis, factors in addition to economic impact on the estate of actions taken may be considered. *In re Spanjer Brothers, Inc.,* 203 B.R. 85, 90 (Bankr.N.D.Ill.1996). One such factor to be considered is "whether the services rendered promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided for under the Bankruptcy Code and Rules for the orderly and prompt disposition of bankruptcy cases and related adversary proceedings." *Id.*

■ Here the trustee's attorney services in defending the Alpern motions and mandamus action benefitted the estate. The trustee was seeking to uphold the bankruptcy judge's orders involving sale of estate property, and also orders that denied the judge's disqualification and recusal. The sale had been delayed by Alpern for over two years. Moreover, Judge James' recusal would have resulted in greater delay in disposition of the case because the case would have been assigned to another judge who would then have to become familiar with the facts. By defending the mandamus action, the trustee helped to prevent any further delay in the case going forward.

Trustees and their counsel are certainly expected to defend the decisions of judges that the trustees urge upon the court, and can hardly be faulted for such work or for seeking related compensation.

### Miscellaneous

■ Fisher's pleadings ask for unspecified sanctions for Alpern's allegations, based on unspecified authority. If he is serious, a focused motion is required specifying authority relied on and particularizing sanctionable pleadings supposedly covered by that authority. He will by order be given limited time to file, notice, and present such motion in court, and his request for sanctions will now be stricken without prejudice to his doing that within the limited time period.

■ Finally, Alpern's practice of filing letters not noticed or presented for hearing must be dealt with, and an order will provide for all such to be stricken if not presented on notice within a period to be fixed. His practice of mailing letters to the judge will be dealt with as in the past by the staff returning of those letters unread by the judge.

## CONCLUSION

Pursuant to the foregoing discussion, several orders will be separately entered:

1. Denying Alpern's motion for a special or further accounting by the Trustee.

2. Denying Alpern's motion to remove Trustee Fisher.

3. Striking under Rule 12(f) F.R.Civ.P. (Rule 9014 F.R.Bankr.P.) all pleadings of Alpern accusing Fisher of theft and bribery, and all pleadings accusing former Judge James of accepting a bribe and conversion of estate property and striking Alpern's letter of March 4, 1996 addressed to the Deputy U.S. Attorney that contained many accusations and was filed with the Clerk, but not presented to this Court for ruling or on notice.

4. Striking Fisher's request for sanctions without prejudice to his filing a focused motion for sanctions, if any, within a period of time provided.

5. Striking all future letters or pleadings delivered by Alpern to the Clerk for filing but not presented to this Court for action or notice within 14 calendar days after the filing thereof, without any further order being required, except for appeal papers other than motions for stay that seek to appeal orders of this Court.